(Slip Opinion)     OCTOBER TERM, 2006     1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## BRENDLIN *v.* CALIFORNIA

### CERTIORARI TO THE SUPREME COURT OF CALIFORNIA

No. 06–8120.   Argued April 23, 2007—Decided June 18, 2007

After officers stopped a car to check its registration without reason to believe it was being operated unlawfully, one of them recognized petitioner Brendlin, a passenger in the car.  Upon verifying that Brendlin was a parole violator, the officers formally arrested him and searched him, the driver, and the car, finding, among other things, methamphetamine paraphernalia.  Charged with possession and manufacture of that substance, Brendlin moved to suppress the evidence obtained in searching his person and the car, arguing that the officers lacked probable cause or reasonable suspicion to make the traffic stop, which was an unconstitutional seizure of his person.  The trial court denied the motion, but the California Court of Appeal reversed, holding that Brendlin was seized by the traffic stop, which was unlawful.  Reversing, the State Supreme Court held that suppression was unwarranted because a passenger is not seized as a constitutional matter absent additional circumstances that would indicate to a reasonable person that he was the subject of the officer's investigation or show of authority.

*Held:* When police make a traffic stop, a passenger in the car, like the driver, is seized for Fourth Amendment purposes and so may challenge the stop's constitutionality.  Pp. 4–13.

   (a) A person is seized and thus entitled to challenge the government's action when officers, by physical force or a show of authority, terminate or restrain the person's freedom of movement through means intentionally applied.  *Florida* v. *Bostick*, 501 U. S. 429, 434; *Brower* v. *County of Inyo*, 489 U. S. 593, 597.  There is no seizure without that person's actual submission.  See, *e.g., California* v. *Hodari D.*, 499 U. S. 621, 626, n. 2.  When police actions do not show an unambiguous intent to restrain or when an individual's submission takes the form of passive acquiescence, the test for telling when a

seizure occurs is whether, in light of all the surrounding circum-
stances, a reasonable person would have believed he was not free to
leave. *E.g., United States* v. *Mendenhall*, 446 U. S. 544, 554 (princi-
pal opinion). But when a person "has no desire to leave" for reasons
unrelated to the police presence, the "coercive effect of the encounter"
can be measured better by asking whether "a reasonable person
would feel free to decline the officers' requests or otherwise terminate
the encounter." *Bostick*, *supra*, at 435–436. Pp. 4–6.

   (b) Brendlin was seized because no reasonable person in his posi-
tion when the car was stopped would have believed himself free to
"terminate the encounter" between the police and himself. *Bostick*,
*supra*, at 436. Any reasonable passenger would have understood the
officers to be exercising control to the point that no one in the car was
free to depart without police permission. A traffic stop necessarily
curtails a passenger's travel just as much as it halts the driver, di-
verting both from the stream of traffic to the side of the road, and the
police activity that normally amounts to intrusion on "privacy and
personal security" does not normally (and did not here) distinguish
between passenger and driver. *United States* v. *Martinez-Fuerte*, 428
U. S. 543, 554. An officer who orders a particular car to pull over acts
with an implicit claim of right based on fault of some sort, and a sen-
sible person would not expect the officer to allow people to come and
go freely from the physical focal point of an investigation into faulty
behavior or wrongdoing. If the likely wrongdoing is not the driving,
the passenger will reasonably feel subject to suspicion owing to close
association; but even when the wrongdoing is only bad driving, the
passenger will expect to be subject to some scrutiny, and his attempt
to leave would be so obviously likely to prompt an objection from the
officer that no passenger would feel free to leave in the first place. It
is also reasonable for passengers to expect that an officer at the scene
of a crime, arrest, or investigation will not let people move around in
ways that could jeopardize his safety. See, *e.g., Maryland* v. *Wilson*,
519 U. S. 408, 414–415. The Court's conclusion comports with the
views of all nine Federal Courts of Appeals, and nearly every state
court, to have ruled on the question. Pp. 6–9.

   (c) The State Supreme Court's contrary conclusion reflects three
premises with which this Court respectfully disagrees. First, the
view that the police only intended to investigate the car's driver and
did not direct a show of authority toward Brendlin impermissibly
shifts the issue from the intent of the police as objectively manifested
to the motive of the police for taking the intentional action to stop the
car. Applying the objective *Mendenhall* test resolves any ambiguity
by showing that a reasonable passenger would understand that he
was subject to the police display of authority. Second, the state

Syllabus

court's assumption that Brendlin, as the passenger, had no ability to submit to the police show of authority because only the driver was in control of the moving car is unavailing. Brendlin had no effective way to signal submission while the car was moving, but once it came to a stop he could, and apparently did, submit by staying inside. Third, there is no basis for the state court's fear that adopting the rule this Court applies would encompass even those motorists whose movement has been impeded due to the traffic stop of another car. An occupant of a car who knows he is stuck in traffic because another car has been pulled over by police would not perceive the show of authority as directed at him or his car. Pp. 9–13.

    (d) The state courts are left to consider in the first instance whether suppression turns on any other issue. P. 13.

38 Cal. 4th 1107, 136 P. 3d 845, vacated and remanded.

    SOUTER, J., delivered the opinion for a unanimous Court.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 06–8120

BRUCE EDWARD BRENDLIN, PETITIONER *v.*
CALIFORNIA

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
CALIFORNIA

[June 18, 2007]

JUSTICE SOUTER delivered the opinion of the Court.

When a police officer makes a traffic stop, the driver of the car is seized within the meaning of the Fourth Amendment. The question in this case is whether the same is true of a passenger. We hold that a passenger is seized as well and so may challenge the constitutionality of the stop.

I

Early in the morning of November 27, 2001, Deputy Sheriff Robert Brokenbrough and his partner saw a parked Buick with expired registration tags. In his ensuing conversation with the police dispatcher, Brokenbrough learned that an application for renewal of registration was being processed. The officers saw the car again on the road, and this time Brokenbrough noticed its display of a temporary operating permit with the number "11," indicating it was legal to drive the car through November. App. 115. The officers decided to pull the Buick over to verify that the permit matched the vehicle, even though, as Brokenbrough admitted later, there was nothing unusual about the permit or the way it was affixed. Brokenbrough

asked the driver, Karen Simeroth, for her license and saw a passenger in the front seat, petitioner Bruce Brendlin, whom he recognized as "one of the Brendlin brothers." *Id.,* at 65. He recalled that either Scott or Bruce Brendlin had dropped out of parole supervision and asked Brendlin to identify himself.[1] Brokenbrough returned to his cruiser, called for backup, and verified that Brendlin was a parole violator with an outstanding no-bail warrant for his arrest. While he was in the patrol car, Brokenbrough saw Brendlin briefly open and then close the passenger door of the Buick. Once reinforcements arrived, Brokenbrough went to the passenger side of the Buick, ordered him out of the car at gunpoint, and declared him under arrest. When the police searched Brendlin incident to arrest, they found an orange syringe cap on his person. A patdown search of Simeroth revealed syringes and a plastic bag of a green leafy substance, and she was also formally arrested. Officers then searched the car and found tubing, a scale, and other things used to produce methamphetamine.

Brendlin was charged with possession and manufacture of methamphetamine, and he moved to suppress the evidence obtained in the searches of his person and the car as fruits of an unconstitutional seizure, arguing that the officers lacked probable cause or reasonable suspicion to make the traffic stop. He did not assert that his Fourth Amendment rights were violated by the search of Simeroth's vehicle, cf. *Rakas* v. *Illinois*, 439 U. S. 128 (1978), but claimed only that the traffic stop was an unlawful seizure of his person. The trial court denied the suppression motion after finding that the stop was lawful and Brendlin was not seized until Brokenbrough ordered him out of the car and formally arrested him. Brendlin

―――――――
[1] The parties dispute the accuracy of the transcript of the suppression hearing and disagree as to whether Brendlin gave his name or the false name "Bruce Brown." App. 115.

pleaded guilty, subject to appeal on the suppression issue, and was sentenced to four years in prison.

The California Court of Appeal reversed the denial of the suppression motion, holding that Brendlin was seized by the traffic stop, which they held unlawful. 8 Cal. Rptr. 3d 882 (2004) (officially depublished). By a narrow majority, the Supreme Court of California reversed. The State Supreme Court noted California's concession that the officers had no reasonable basis to suspect unlawful operation of the car, 38 Cal. 4th 1107, 1114, 136 P. 3d 845, 848 (2006),[2] but still held suppression unwarranted because a passenger "is not seized as a constitutional matter in the absence of additional circumstances that would indicate to a reasonable person that he or she was the subject of the peace officer's investigation or show of authority," *id.*, at 1111, 136 P. 3d, at 846. The court reasoned that Brendlin was not seized by the traffic stop because Simeroth was its exclusive target, *id.*, at 1118, 136 P. 3d, at 851, that a passenger cannot submit to an officer's show of authority while the driver controls the car, *id.*, at 1118–1119, 135 P. 3d, at 851–852, and that once a car has been pulled off the road, a passenger "would feel free to depart or otherwise to conduct his or her affairs as though the police were not present," *id.*, at 1119, 136 P. 3d, at 852. In dissent, Justice Corrigan said that a traffic stop entails the seizure of a passenger even when the driver is the sole target of police investigation because a passenger is detained for the purpose of ensuring an officer's safety and would not feel free to leave the car without the officer's permission. *Id.*, at 1125, 136 P. 3d, at 856.

We granted certiorari to decide whether a traffic stop

_____

[2] California conceded that the police officers lacked reasonable suspicion to justify the traffic stop because a "'vehicle with an application for renewal of expired registration would be expected to have a temporary operating permit.'" 38 Cal. 4th, at 1114, 136 P. 3d, at 848 (quoting Brief for Respondent California in No. S123133 (Sup. Ct. Cal.), p. 24).

subjects a passenger, as well as the driver, to Fourth Amendment seizure, 549 U. S. __ (2007). We now vacate.

## II

## A

A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, "'by means of physical force or show of authority,'" terminates or restrains his freedom of movement, *Florida* v. *Bostick*, 501 U. S. 429, 434 (1991) (quoting *Terry* v. *Ohio*, 392 U. S. 1, 19, n. 16 (1968)), "*through means intentionally applied*," *Brower* v. *County of Inyo*, 489 U. S. 593, 597 (1989) (emphasis in original). Thus, an "unintended person . . . [may be] the object of the detention," so long as the detention is "willful" and not merely the consequence of "an unknowing act." *Id*., at 596; cf. *County of Sacramento* v. *Lewis*, 523 U. S. 833, 844 (1998) (no seizure where a police officer accidentally struck and killed a motorcycle passenger during a high-speed pursuit). A police officer may make a seizure by a show of authority and without the use of physical force, but there is no seizure without actual submission; otherwise, there is at most an attempted seizure, so far as the Fourth Amendment is concerned. See *California* v. *Hodari D.*, 499 U. S. 621, 626, n. 2 (1991); *Lewis*, *supra*, at 844, 845, n. 7.

When the actions of the police do not show an unambiguous intent to restrain or when an individual's submission to a show of governmental authority takes the form of passive acquiescence, there needs to be some test for telling when a seizure occurs in response to authority, and when it does not. The test was devised by Justice Stewart in *United States* v. *Mendenhall*, 446 U. S. 544 (1980), who wrote that a seizure occurs if "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave," *id*., at

554 (principal opinion). Later on, the Court adopted Justice Stewart's touchstone, see, *e.g.*, *Hodari D.*, *supra*, at 627; *Michigan* v. *Chesternut*, 486 U. S. 567, 573 (1988); *INS* v. *Delgado*, 466 U. S. 210, 215 (1984), but added that when a person "has no desire to leave" for reasons unrelated to the police presence, the "coercive effect of the encounter" can be measured better by asking whether "a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter," *Bostick*, *supra*, at 435–436; see also *United States* v. *Drayton*, 536 U. S. 194, 202 (2002).

The law is settled that in Fourth Amendment terms a traffic stop entails a seizure of the driver "even though the purpose of the stop is limited and the resulting detention quite brief." *Delaware* v. *Prouse*, 440 U. S. 648, 653 (1979); see also *Whren* v. *United States*, 517 U. S. 806, 809–810 (1996). And although we have not, until today, squarely answered the question whether a passenger is also seized, we have said over and over in dicta that during a traffic stop an officer seizes everyone in the vehicle, not just the driver. See, *e.g.*, *Prouse*, *supra*, at 653 ("[S]topping an automobile and detaining its occupants constitute a 'seizure' within the meaning of [the Fourth and Fourteenth] Amendments"); *Colorado* v. *Bannister*, 449 U. S. 1, 4, n. 3 (1980) *(per curiam)* ("There can be no question that the stopping of a vehicle and the detention of its occupants constitute a 'seizure' within the meaning of the Fourth Amendment"); *Berkemer* v. *McCarty*, 468 U. S. 420, 436–437 (1984) ("[W]e have long acknowledged that stopping an automobile and detaining its occupants constitute a seizure" (internal quotation marks omitted)); *United States* v. *Hensley*, 469 U. S. 221, 226 (1985) ("[S]topping a car and detaining its occupants constitute a seizure"); *Whren*, *supra*, at 809–810 ("Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose,

constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]").

We have come closest to the question here in two cases dealing with unlawful seizure of a passenger, and neither time did we indicate any distinction between driver and passenger that would affect the Fourth Amendment analysis. *Delaware* v. *Prouse* considered grounds for stopping a car on the road and held that Prouse's suppression motion was properly granted. We spoke of the arresting officer's testimony that Prouse was in the back seat when the car was pulled over, see 440 U. S., at 650, n. 1, described Prouse as an occupant, not as the driver, and referred to the car's "occupants" as being seized, *id.*, at 653. Justification for stopping a car was the issue again in *Whren* v. *United States*, where we passed upon a Fourth Amendment challenge by two petitioners who moved to suppress drug evidence found during the course of a traffic stop. See 517 U. S., at 809. Both driver and passenger claimed to have been seized illegally when the police stopped the car; we agreed and held suppression unwarranted only because the stop rested on probable cause. *Id.*, at 809–810, 819.

B

The State concedes that the police had no adequate justification to pull the car over, see n. 2, *supra*, but argues that the passenger was not seized and thus cannot claim that the evidence was tainted by an unconstitutional stop. We resolve this question by asking whether a reasonable person in Brendlin's position when the car stopped would have believed himself free to "terminate the encounter" between the police and himself. *Bostick*, *supra*, at 436. We think that in these circumstances any reasonable passenger would have understood the police officers to be exercising control to the point that no one in the car was free to depart without police permission.

A traffic stop necessarily curtails the travel a passenger has chosen just as much as it halts the driver, diverting both from the stream of traffic to the side of the road, and the police activity that normally amounts to intrusion on "privacy and personal security" does not normally (and did not here) distinguish between passenger and driver. *United States* v. *Martinez-Fuerte*, 428 U. S. 543, 554 (1976). An officer who orders one particular car to pull over acts with an implicit claim of right based on fault of some sort, and a sensible person would not expect a police officer to allow people to come and go freely from the physical focal point of an investigation into faulty behavior or wrongdoing. If the likely wrongdoing is not the driving, the passenger will reasonably feel subject to suspicion owing to close association; but even when the wrongdoing is only bad driving, the passenger will expect to be subject to some scrutiny, and his attempt to leave the scene would be so obviously likely to prompt an objection from the officer that no passenger would feel free to leave in the first place. Cf. *Drayton, supra*, at 197–199, 203–204 (finding no seizure when police officers boarded a stationary bus and asked passengers for permission to search for drugs).[3]

It is also reasonable for passengers to expect that a police officer at the scene of a crime, arrest, or investigation will not let people move around in ways that could jeopardize his safety. In *Maryland* v. *Wilson*, 519 U. S. 408 (1997), we held that during a lawful traffic stop an officer may order a passenger out of the car as a precau-

_____

[3] Of course, police may also stop a car solely to investigate a passenger's conduct. See, *e.g.*, *United States* v. *Rodriguez-Diaz*, 161 F. Supp. 2d 627, 629, n. 1 (Md. 2001) (passenger's violation of local seatbelt law); *People* v. *Roth*, 85 P. 3d 571, 573 (Colo. App. 2003) (passenger's violation of littering ordinance). Accordingly, a passenger cannot assume, merely from the fact of a traffic stop, that the driver's conduct is the cause of the stop.

tionary measure, without reasonable suspicion that the passenger poses a safety risk. *Id.*, at 414–415; cf. *Pennsylvania* v. *Mimms*, 434 U. S. 106 (1977) *(per curiam)* (driver may be ordered out of the car as a matter of course). In fashioning this rule, we invoked our earlier statement that "'[t]he risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation.'" *Wilson*, *supra*, at 414 (quoting *Michigan* v. *Summers*, 452 U. S. 692, 702–703 (1981)). What we have said in these opinions probably reflects a societal expectation of "'unquestioned [police] command'" at odds with any notion that a passenger would feel free to leave, or to terminate the personal encounter any other way, without advance permission. *Wilson*, *supra*, at 414.[4]

Our conclusion comports with the views of all nine Federal Courts of Appeals, and nearly every state court, to have ruled on the question. See *United States* v. *Kimball*, 25 F. 3d 1, 5 (CA1 1994); *United States* v. *Mosley*, 454 F. 3d 249, 253 (CA3 2006); *United States* v. *Rusher*, 966 F. 2d 868, 874, n. 4 (CA4 1992); *United States* v. *Grant*, 349 F. 3d 192, 196 (CA5 2003); *United States* v. *Perez*, 440 F. 3d 363, 369 (CA6 2006); *United States* v. *Powell*, 929 F. 2d 1190, 1195 (CA7 1991); *United States* v. *Ameling*, 328 F. 3d 443, 446–447, n. 3 (CA8 2003); *United States* v. *Twilley*, 222 F. 3d 1092, 1095 (CA9 2000); *United States* v. *Eylicio-Montoya*, 70 F. 3d 1158, 1163–1164 (CA10 1995); *State* v. *Bowers*, 334 Ark. 447, 451–452, 976 S. W. 2d 379, 381–382 (1998); *State* v. *Haworth*, 106 Idaho 405, 405–406, 679 P. 2d 1123, 1123–1124 (1984); *People* v. *Bunch*,

—————

[4] Although the State Supreme Court inferred from Brendlin's decision to open and close the passenger door during the traffic stop that he was "awar[e] of the available options," 38 Cal. 4th 1107, 1120, 136 P. 3d 845, 852 (2006), this conduct could equally be taken to indicate that Brendlin felt compelled to remain inside the car. In any event, the test is not what Brendlin felt but what a reasonable passenger would have understood.

207 Ill. 2d 7, 13, 796 N. E. 2d 1024, 1029 (2003); *State* v. *Eis*, 348 N. W. 2d 224, 226 (Iowa 1984); *State* v. *Hodges*, 252 Kan. 989, 1002–1005, 851 P. 2d 352, 361–362 (1993); *State* v. *Carter*, 69 Ohio St. 3d 57, 63, 630 N. E. 2d 355, 360 (1994) *(per curiam); State* v. *Harris*, 206 Wis. 2d 243, 253–258, 557 N. W. 2d 245, 249–251 (1996).　And the treatise writers share this prevailing judicial view that a passenger may bring a Fourth Amendment challenge to the legality of a traffic stop.　See, *e.g.*, 6 W. LaFave, Search and Seizure §11.3(e), pp. 194, 195, and n. 277 (4th ed. 2004 and Supp. 2007) ("If either the stopping of the car, the length of the passenger's detention thereafter, or the passenger's removal from it are unreasonable in a Fourth Amendment sense, then surely the passenger has standing to object to those constitutional violations and to have suppressed any evidence found in the car which is their fruit" (footnote omitted)); 1 W. Ringel, Searches & Seizures, Arrests and Confessions §11:20, p. 11–98 (2d ed. 2007) ("[A] law enforcement officer's stop of an automobile results in a seizure of both the driver and the passenger").[5]

## C

The contrary conclusion drawn by the Supreme Court of California, that seizure came only with formal arrest, reflects three premises as to which we respectfully disagree.　First, the State Supreme Court reasoned that Brendlin was not seized by the stop because Deputy Sheriff Brokenbrough only intended to investigate Simeroth and did not direct a show of authority toward Brendlin. The court saw Brokenbrough's "flashing lights [as] directed at the driver," and pointed to the lack of record evidence that Brokenbrough "was even aware [Brendlin]

---

[5] Only two State Supreme Courts, other than California's, have stood against this tide of authority.　See *People* v. *Jackson*, 39 P. 3d 1174, 1184–1186 (Colo. 2002) (en banc); *State* v. *Mendez*, 137 Wash. 2d 208, 222–223, 970 P. 2d 722, 729 (1999) (en banc).

was in the car prior to the vehicle stop." 38 Cal. 4th, at 1118, 136 P. 3d, at 851. But that view of the facts ignores the objective *Mendenhall* test of what a reasonable passenger would understand. To the extent that there is anything ambiguous in the show of force (was it fairly seen as directed only at the driver or at the car and its occupants?), the test resolves the ambiguity, and here it leads to the intuitive conclusion that all the occupants were subject to like control by the successful display of authority. The State Supreme Court's approach, on the contrary, shifts the issue from the intent of the police as objectively manifested to the motive of the police for taking the intentional action to stop the car, and we have repeatedly rejected attempts to introduce this kind of subjectivity into Fourth Amendment analysis. See, *e.g.*, *Whren*, 517 U. S., at 813 ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis"); *Chesternut*, 486 U. S., at 575, n. 7 ("[T]he subjective intent of the officers is relevant to an assessment of the Fourth Amendment implications of police conduct only to the extent that that intent has been conveyed to the person confronted"); *Mendenhall*, 446 U. S., at 554, n. 6 (principal opinion) (disregarding a Government agent's subjective intent to detain Mendenhall); cf. *Rakas*, 439 U. S., at 132–135 (rejecting the "target theory" of Fourth Amendment standing, which would have allowed "any criminal defendant at whom a search was directed" to challenge the legality of the search (internal quotation marks omitted)).

California defends the State Supreme Court's ruling on this point by citing our cases holding that seizure requires a purposeful, deliberate act of detention. See Brief for Respondent 9–14. But *Chesternut*, *supra*, answers that argument. The intent that counts under the Fourth Amendment is the "intent [that] has been conveyed to the person confronted," *id.*, at 575, n. 7, and the criterion of willful restriction on freedom of movement is no invitation

to look to subjective intent when determining who is seized. Our most recent cases are in accord on this point. In *Lewis*, 523 U. S. 833, we considered whether a seizure occurred when an officer accidentally ran over a passenger who had fallen off a motorcycle during a high-speed chase, and in holding that no seizure took place, we stressed that the officer stopped Lewis's movement by accidentally crashing into him, not "through means intentionally applied." *Id.*, at 844 (emphasis deleted). We did not even consider, let alone emphasize, the possibility that the officer had meant to detain the driver only and not the passenger. Nor is *Brower*, 489 U. S. 593, to the contrary, where it was dispositive that "Brower was meant to be stopped by the physical obstacle of the roadblock—and that he was so stopped." *Id.*, at 599. California reads this language to suggest that for a specific occupant of the car to be seized he must be the motivating target of an officer's show of authority, see Brief for Respondent 12, as if the thrust of our observation were that Brower, and not someone else, was "meant to be stopped." But our point was not that Brower alone was the target but that officers detained him "through means intentionally applied"; if the car had had another occupant, it would have made sense to hold that he too had been seized when the car collided with the roadblock. Neither case, then, is at odds with our holding that the issue is whether a reasonable passenger would have perceived that the show of authority was at least partly directed at him, and that he was thus not free to ignore the police presence and go about his business.

Second, the Supreme Court of California assumed that Brendlin, "as the passenger, had no ability to submit to the deputy's show of authority" because only the driver was in control of the moving vehicle. 38 Cal. 4th, at 1118, 1119, 136 P. 3d, at 852. But what may amount to submission depends on what a person was doing before the show of authority: a fleeing man is not seized until he is physi-

cally overpowered, but one sitting in a chair may submit to authority by not getting up to run away. Here, Brendlin had no effective way to signal submission while the car was still moving on the roadway, but once it came to a stop he could, and apparently did, submit by staying inside.

Third, the State Supreme Court shied away from the rule we apply today for fear that it "would encompass even those motorists following the vehicle subject to the traffic stop who, by virtue of the original detention, are forced to slow down and perhaps even come to a halt in order to accommodate that vehicle's submission to police authority." *Id.,* at 1120, 136 P. 3d, at 853. But an occupant of a car who knows that he is stuck in traffic because another car has been pulled over (like the motorist who can't even make out why the road is suddenly clogged) would not perceive a show of authority as directed at him or his car. Such incidental restrictions on freedom of movement would not tend to affect an individual's "sense of security and privacy in traveling in an automobile." *Prouse*, 440 U. S., at 662. Nor would the consequential blockage call for a precautionary rule to avoid the kind of "arbitrary and oppressive interference by [law] enforcement officials with the privacy and personal security of individuals" that the Fourth Amendment was intended to limit. *Martinez-Fuerte*, 428 U. S., at 554.[6]

Indeed, the consequence to worry about would not flow from our conclusion, but from the rule that almost all courts have rejected. Holding that the passenger in a

_____

[6] California claims that, under today's rule, "all taxi cab and bus passengers would be 'seized' under the Fourth Amendment when the cab or bus driver is pulled over by the police for running a red light." Brief for Respondent 23. But the relationship between driver and passenger is not the same in a common carrier as it is in a private vehicle, and the expectations of police officers and passengers differ accordingly. In those cases, as here, the crucial question would be whether a reasonable person in the passenger's position would feel free to take steps to terminate the encounter.

private car is not (without more) seized in a traffic stop would invite police officers to stop cars with passengers regardless of probable cause or reasonable suspicion of anything illegal.[7] The fact that evidence uncovered as a result of an arbitrary traffic stop would still be admissible against any passengers would be a powerful incentive to run the kind of "roving patrols" that would still violate the driver's Fourth Amendment right. See, *e.g.*, *Almeida-Sanchez* v. *United States*, 413 U. S. 266, 273 (1973) (stop and search by Border Patrol agents without a warrant or probable cause violated the Fourth Amendment); *Prouse*, *supra*, at 663 (police spot check of driver's license and registration without reasonable suspicion violated the Fourth Amendment).

\* \* \*

Brendlin was seized from the moment Simeroth's car came to a halt on the side of the road, and it was error to deny his suppression motion on the ground that seizure occurred only at the formal arrest. It will be for the state courts to consider in the first instance whether suppression turns on any other issue. The judgment of the Supreme Court of California is vacated, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

---

[7] Compare *Delaware* v. *Prouse*, 440 U. S. 648, 663 (1979) (requiring "at least articulable and reasonable suspicion" to support random, investigative traffic stops), and *United States* v. *Brignoni-Ponce*, 422 U. S. 873, 880–884 (1975) (same), with *Whren* v. *United States,* 517 U. S. 806, 810 (1996) ("[T]he decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred"), and *Atwater* v. *Lago Vista*, 532 U. S. 318, 354 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender").