Filed 3/15/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B328954 |
| Plaintiff and Respondent, | Los Angeles County Super. Ct. No. TA155176 |
| v. | |
| ALBERT JACKSON, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Hector E. Gutierrez, Judge. Reversed and remanded.

Lauren Noriega, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Amanda V. Lopez, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Around midnight, two officers in a cruiser saw Albert Jackson alone in a parked car. They pulled alongside, close enough so Jackson would have to squeeze to get out. One officer

went to Jackson's side of the car, while the other walked to Jackson's passenger side. Both shined flashlights on Jackson. By boxing in and surrounding Jackson, the officers' actions meant a reasonable person in his position would not feel free to leave.

The officers explained why they took these steps. Jackson was wearing a "big bulky jacket" on a "hot" and "humid" night. He "was seated kind of awkwardly in the driver's seat." And when they approached in the dark and shined flashlights on him, he looked "uncomfortable and kind of nervous," "like he was surprised to see us."

The officers' stated observations did not suggest criminal activity might be afoot. Jackson's detention violated the Fourth Amendment. We suppress the evidence the officers found as a result of this detention. Statutory citations are to the Penal Code.

I

Two officers of the Los Angeles Police Department were patrolling near Compton. Officer Joseph Chavez was driving east on 109th Street from San Pedro Street towards Avalon Boulevard. His passenger and partner was Officer Jebert Ybanez. Shortly before midnight on July 12, 2021, they noticed a car parked on the south side of 109th Street between Avalon and San Pedro. It was an SUV they described variously as a Range Rover or a Land Rover. Chavez and Ybanez were the two lone witnesses at the hearing on Jackson's suppression motion. We recount their testimony, beginning with Chavez.

2

## A

Chavez testified his partner Ybanez told him "there was someone in the car, so I stopped . . . our police car, pretty much alongside this Range Rover I am speaking about."

"Q:  And why did you do that there?

[Chavez]:  There was a male seated kind of awkwardly in the driver's seat.

Q:  Can you explain how he was seated awkwardly?

[Chavez]:  For one, he had a big jacket on.  It's, you know, midsummer; so we thought, kind of odd, like a big bulky jacket for the temperature.  [¶]  And then, two, it kind of -- after illuminating him with the light -- my partner illuminated him -- he kind of -- he looked kind of nervous.  He looked kind of like he was kind of halfway in, halfway out of the driver's seat.

Q:  Was his leg sticking out of the car?"

"[Chavez]:  I don't remember about his legs, but I remember he was kind of seated kind of -- he just looked, like, kind of, like, uncomfortable and kind of nervous.  So I exited . . . my police car, put it in park, and my partner started talking to him. . . ."

"Q:  . . . At this point, was he free to leave?

[Chavez]:  Yes."

"[Chavez]:  When [Ybanez] first started talking to [Jackson], I was seated in the driver's seat of our police car.

Q:  Okay.  And at what point did you exit the vehicle?

[Chavez]:  I would say a short -- a short moment after, maybe a couple of seconds."

"[Chavez]:  I got out of the driver's seat of our car . . . and then walked around the trunk of the rear of the defendant's car and then walked up to the front passenger side . . . ."

"Q: What criminal activity did you believe sitting awkwardly suggested?

[Chavez]: A couple things. I believed, based on my training and experience and my knowledge of the area, that specific block; you know, the time of night -- it's a high-end car, like, a really nice, I think Range Rover or Land Rover -- one of these kind of higher-end vehicles, I thought based on just first initial --

Q: Based on how he's sitting is my question.

[Chavez]: Yes. That the car could have been stolen, the defendant could be concealing something, he could -- and then also too -- well, criminal activity, yeah. [¶] I couldn't -- I couldn't see much more past that, but just based upon his seating position and how nervous he was acting, yeah, that definitely was a thought in my mind that the car possibly could be stolen or he could be concealing something on his person, especially in that jacket. . . ."

"Q: . . . [H]ow are you able to tell by the way that somebody's sitting that they could have stolen a car?

[Chavez]: Well, I'd be unable to tell if they stole a car based on how they were sitting. I'm just going off of his -- like, his position and what I thought when I saw his position."

Chavez and Ybanez shined their flashlights on Jackson.

Chavez became suspicious of Jackson "pretty early on in this contact."

B

Ybanez testified to his perspective. Ybanez saw Jackson in the parked car.

"We noticed that [Jackson] was acting a little strange. He seemed like he was surprised to see us. It was also middle of

4

July.  He was wearing a thick jacket, which we found to be strange at the time."  It was strange because the night was "hot." Ybanez did not remember the approximate temperature.  That night also was "humid."

Ybanez agreed it "would be a subjective determination if someone's acting strange."

Ybanez and Chavez got out of their car.  Ybanez approached the driver's side of Jackson's car while Chavez went to the other side.

Ybanez's opinion was that they had not detained Jackson at this point:  Jackson was free to leave, and the encounter was "consensual."

"So we got [to making] small talk with him."  After about 10 seconds, Chavez spied a gun, called it out, backup arrived, and police arrested Jackson.

C

In her initial motion to suppress, defense counsel argued that "[w]earing a bulky jacket in 60-something degree weather, without more, certainly does not [imply] criminal activity is afoot. This unreasonable inference is [a] textbook example of law enforcement hunch and conjecture with underpinnings of racial discrimination."

The magistrate denied Jackson's motion to suppress without disclosing her reasoning and held Jackson to answer.

Jackson filed a motion under section 995 to challenge the holding order from the preliminary hearing.

In this motion, Jackson's counsel argued that "African American men are justified when becoming fearful of white officers who approach them late at night while they are alone. . . . As this Motion discusses, the assumption that an African

American man in an expensive car is a criminal or that the vehicle is stolen, based solely on the way he looks and without any indication of criminal activity, is not in line with the Fourth Amendment."

"A quick historical weather search reveals that the temperature this night around midnight was low to mid 60's. There is no shortage of Angelinos who readily wear jackets when the weather is within this range. Mr. Jackson's clothing was not suspicious to any reasonable individual. It begs the question – whether the officers would have also suspected a middle-aged Caucasian woman wearing a thick coat in the same location to have stolen a vehicle, just as they suspected of Mr. Jackson."

"Officer Chavez testified he was immediately suspicious of Mr. Jackson based on the way he was seated. The officers were suspicious of an African American man in a high-end vehicle. The officers' reflex assumption is that it must be stolen. This thought was formed in the absence of any facts, whatsoever, to suggest Mr. Jackson was in a stolen vehicle. Had a Caucasian female been the driver, the court should consider the likelihood that the officers would form the same assumption."

The prosecution argued the incident was a consensual stop. The trial court agreed and denied the motion.

Jackson renewed his motion to suppress. The trial court denied the motion, finding the claims had already been denied on the merits in the section 995 motion.

Pursuant to a plea agreement, Jackson entered a plea of no contest to a felon-in-possession charge. The trial court sentenced him to 16 months in state prison. Jackson appealed.

## II

The crucial distinction here is between a consensual encounter and a detention.

## A

Consensual encounters require no justification. Police may approach people in public and engage them in consensual conversation and ask if they are willing to answer questions. Merely walking up to someone in a parked car is not a detention. Prosecutors may use voluntary answers and the officer's observations in criminal prosecutions. (*People v. Tacardon* (2022) 14 Cal.5th 235, 241 (*Tacardon*).)

Detentions require justification. If an officer's physical force or show of authority restrains someone's liberty in some way, then the officer has seized that person and must justify this detention. In situations involving a show of authority, police seize someone if, in view of all of the circumstances, reasonable people in those shoes would not believe they are free to leave. (*Tacardon*, *supra*, 14 Cal.5th at p. 241; *Brendlin v. California* (2007) 551 U.S. 249, 254–255 (*Brendlin*).)

We consider the totality of the circumstances to determine whether police actions turn an encounter into a detention. Courts note factors like the presence of many officers, police display of weapons, use of sirens or overhead emergency lights, physically touching the person, the use of a patrol car to block movement, or the use of language or of a tone of voice implying compliance with the officer's request is compelled. We review facts objectively. Officers' states of mind are not relevant unless their overt actions communicate those mental states. The subjective belief of the person who is the target of police attention is irrelevant. (*Tacardon*, *supra*, 14 Cal.5th at pp. 241–242.)

7

We defer to the magistrate's express and implied findings of fact if supported by substantial evidence. We independently assess whether the challenged seizure violates the Fourth Amendment, according to federal constitutional standards. (*Tacardon*, *supra*, 14 Cal.5th at p. 242; *People v. Souza* (1994) 9 Cal.4th 224, 232–233.)

Police detained Jackson at some point, but the question is when. If police detained Jackson before Chavez saw the gun in Jackson's pocket and absent other information, the detention would be unjustified. The consequence would be suppression of evidence that was the fruit of the poisonous tree. (*Tacardon*, *supra*, 14 Cal.5th at p. 242; *Nardone v. United States* (1939) 308 U.S. 338, 341.)

B

As a matter of constitutional law, the officers detained Jackson *before* spotting the gun. The officers pulled their car within a few feet of Jackson's open driver's side door, leaving only enough room that, in the officers' opinion, *perhaps* he "could have squeezed out." Then they surrounded his car in the dark and, at close range, aimed two flashlights on him. Under these circumstances, a reasonable person would not feel free to leave. (See *Tacardon*, *supra*, 14 Cal.5th at p. 241; *Brendlin*, *supra*, 551 U.S. at pp. 254–255.)

Pulling the police car so close boxed Jackson in. *Perhaps* he "could have squeezed out." But opening a car door when another car is close by is a delicate operation if one is to avoid paying for an expensive trip to the body shop. When the car they might dent is a *police* car, reasonable people would not attempt to squeeze out the door. Banging up the police car would aggravate a situation reasonable people would want to assuage. The

proximity of the car conveyed a message:  better to stay in your car.  Whatever the officers' subjective intent, the objective and reasonable meaning of this police action was a display of authority and control.

The officers showed authority by surrounding Jackson.

A recent decision applies here.  In the next paragraph, we use brackets to plug Jackson's name into a lengthy quotation from that decision to show its correspondence and force.

Chavez and Ybarra "exited their vehicle, approached . . . [Jackson] from both sides, and shined their flashlights into [Jackson's car] from close range, right at the car door windows. This was a display of authority that would lead a reasonable person to believe he is not free to leave or otherwise disregard the police and go about his business, both because more than one officer approached and because the officers shined their flashlights on [Jackson] from opposite angles, effectively illuminating him on all sides. . . .   If the officers wished to signal that [Jackson] was free to go, the officers could have approached [Jackson's car] from the same side of the vehicle and engaged [Jackson] in casual conversation. The officers instead flanked [Jackson] and approached from both sides while shining their flashlights into the vehicle.  The officers' approach is exactly the kind of coordinated action that an objective person would expect to witness when being detained.  A reasonable person would conclude that when two officers approach in this manner, surrounding the individual in the vehicle, he or she is not free to leave." (*People v. Paul* (2024) 99 Cal.App.5th 832, 840.)

There was no car in front of Jackson, so it would have been possible, physically, for him to drive forward.  (See *Tacardon*, *supra*, 14 Cal.5th at p. 247 [finding no detention where

9

defendant's car was not blocked from driving away].)  Once the officers displayed their authority as they did, however, a reasonable person would have equated driving forward with flouting the officers' show of authority.  It is unwise to flout an officer's show of authority.

C

The justifications for this detention were inadequate.

Officers may conduct an investigatory detention if they have an objectively reasonable suspicion of criminal activity.  Their suspicions must be supported by specific and articulable facts that are reasonably consistent with criminal activity.  We examine the totality of the circumstances.  (*People v. Wells* (2006) 38 Cal.4th 1078, 1083.)

Wearing what someone perceives is a big bulky jacket on what feels to be a hot humid night does not lead an officer reasonably to conclude "that criminal activity may be afoot." (*Terry v. Ohio* (1968) 392 U.S. 1, 30.)  This jacket factor is unremarkable because a universe of alternative explanations exists.

And it is natural for someone to look surprised, nervous, and uncomfortable when police appear out of the dark, park too close for easy exit, surround your car, and shine flashlights on you.

The prosecution argues Jackson "was also sitting in an awkward, uncomfortable position, seemingly 'halfway in, halfway out' of the driver's seat."  This position does not suggest crime.

Taken together, these three factors are insufficient.

The prosecution incorrectly argues the evidence at the suppression hearing showed the officers believed this was a high-

10

crime area.  This argument is based on the following exchange, which we quoted above and now repeat.

"Q:  What criminal activity did you believe sitting awkwardly suggested?

[Chavez]:  A couple things.  I believed, based on my training and experience and my knowledge of the area, that specific block; you know, the time of night -- it's a high-end car, like, a really nice, I think Range Rover or Land Rover -- one of these kind of higher-end vehicles.  I thought based on just first initial --

Q:  Based on how he's sitting is my question.

[Chavez]:  Yes.  That the car could have been stolen, the defendant could be concealing something, he could -- and then also too -- well, criminal activity, yeah.  [¶]  I couldn't -- I couldn't see much more past that, but just based upon his seating position and how nervous he was acting, yeah, that definitely was a thought in my mind that the car possibly could be stolen or he could be concealing something on his person, especially in that jacket. . . ."

"Q:  . . . [H]ow are you able to tell by the way that somebody's sitting that they could have stolen a car?

[Chavez]:  Well, I'd be unable to tell if they stole a car based on how they're sitting. I'm just going off of his -- like, his position and what I thought when I saw his position."

The words "*my knowledge of the area, that specific block; you know, the time of night -- it's a high-end car, like, a really nice, I think Range Rover or Land Rover -- one of these kind of higher-end vehicles*" suggest the officer suspected something based on a "high-end car" parked on "that specific block."  This was the officer's response to a question about Jackson's sitting

11

position.  These words, in this context, are not reasonably interpreted to mean "that specific block" is a high-crime area.

Collectively, these justifications did not create a reasonable suspicion of criminal activity.  The detention was invalid.  (See *People v. Hernandez* (2008) 45 Cal.4th 295, 297, 299–301.)

## DISPOSITION

We reverse the judgment, vacate the conviction, and remand the matter.  On remand, the trial court shall vacate its order denying Jackson's motion to suppress the evidence and shall enter a new order granting that motion.  (*People v. Paul*, *supra*, 99 Cal.App.5th at pp. 841–842.)

WILEY, J.

We concur:

STRATTON, P. J.

VIRAMONTES, J.

12