NOT DESIGNATED FOR PUBLICATION

No. 125,754

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

TASHARA D. YEARGIN-CHARLES,
*Appellant*.


MEMORANDUM OPINION

Appeal from Jackson District Court; NORBERT C. MAREK and MICHAEL E. WARD, judges. Submitted without oral argument. Opinion filed July 26, 2024. Affirmed.

*Ryan J. Eddinger*, of Kansas Appellate Defender Office, for appellant.

*Kurtis K. Wiard*, assistant solicitor general, and *Kris W. Kobach*, attorney general, for appellee.


Before HILL, P.J., ATCHESON and CLINE, JJ.


PER CURIAM:  Passengers in automobiles have standing to judicially contest the admissibility of evidence seized by police from their personal belongings. Tashara D. Yeargin-Charles, a passenger in an automobile, asks us to overturn her criminal convictions because the district court denied her motion to suppress the contraband seized from her purse. She argues the contraband evidence found in her purse should have been suppressed because the law enforcement officers made an illegal traffic stop.

1

*A flapping car tag leads to an early morning car stop.*

In August 2021, Tashara D. Yeargin-Charles was a passenger in a car that was driving on a highway in Jackson County, Kansas, around 3:30 a.m. Deputy Justin Dobler and Sergeant Travis DeBarge observed the car's license plate "flapping in the wind." Deputy Dobler testified that the license plate was secured by one bolt and that he "clearly observed that the registration plate was not securely fastened and was actually hanging to the—slanting to the right, and it was visibly shaking while traveling down the road." Based on observing the car's violation of the statute requiring the proper "display of registration," the officers pulled the car over.

Deputy Dobler approached the passenger side of the car and Sergeant DeBarge approached the driver's side. There were three people in the car: the driver—Karen Nichols; the front seat passenger—Yeargin-Charles; and the rear seat passenger—Rico Taylor. Deputy Dobler had trouble talking to the passengers because the window was barely cracked and Yeargin-Charles was uncooperative—arguing with Deputy Dobler before finally rolling down the window. Throughout the interaction, Sergeant DeBarge primarily talked to Nichols and Taylor, while Deputy Dobler talked to Yeargin-Charles.

Shortly after approaching the car, Sergeant DeBarge saw an open container of alcohol in the back floorboard of the car and, as a result, instructed the three occupants to exit the car so the officers could search the car. Sergeant DeBarge focused his search in the driver's and rear seat passenger's areas of the car. He found a second open container of alcohol under the driver's seat and drug paraphernalia inside Nichols' purse. Deputy Dobler focused his search in and around Yeargin-Charles' seat and found a purse that he observed on Yeargin-Charles' lap when he initially approached the car. Inside the purse, Deputy Dobler found an open bottle of peach vodka, a marijuana cigarette, and a pipe with burnt residue inside—which later tested positive for methamphetamine.

Based on what Deputy Dobler found, he asked Yeargin-Charles for her name and date of birth. She replied that her name was Catrice Lanae Montgomery and that her date of birth was 02/04/1980. Deputy Dobler asked the dispatcher to verify her identity, which the dispatcher could not do. Deputy Dobler continued to search the purse; he found a wallet that contained credit cards and a driving license, both of which belonged to Tashara Yeargin-Charles, whose date of birth was 03/25/1978.

*More dramatic events begin when her purse was searched.*

While Deputy Dobler searched the purse, Yeargin-Charles suddenly dropped to the ground, claiming she was pregnant and that her water broke. Deputy Dobler requested emergency medical personnel to respond based on Yeargin-Charles' claim. As the medical staff arrived, Yeargin-Charles laid on the ground, "screaming, farting, and trying to force herself to throw up." She exclaimed that "her water was breaking. She was having pains towards the stomach and her butt. She was appearing to have dry heaving or almost throwing up-type with no liquid coming out. She was farting, and just doing the moaning and obvious sounds of pain." Though, Deputy Dobler testified that he did not see any indication that her water broke—noting there was no liquid on the ground.

She then told Sergeant DeBarge that she was a paranoid schizophrenic and later that she was sick with Covid. Sergeant DeBarge communicated with the dispatcher and informed dispatch of the name found on Yeargin-Charles driving license and credit cards, which was also confirmed by the other passengers. Additionally, Sergeant DeBarge had the dispatcher check for tattoos listed from Yeargin-Charles' previous jail sentence. Sergeant DeBarge learned that Yeargin-Charles had a tattoo of a rose and her daughter's name on her right arm, and he confirmed that these tattoos were on Yeargin-Charles.

Emergency medical personnel transported Yeargin-Charles to Stormont-Vail in Topeka, at her request. While at the hospital, medical staff reported to law enforcement that Yeargin-Charles was not pregnant and instead was under the influence of drugs.

*Yeargin-Charles moves to suppress evidence.*

The State charged Yeargin-Charles with (1) possession of methamphetamine, a severity level 5 drug nonperson felony; (2) interference with law enforcement—falsely reporting information, a severity level 9 nonperson felony; (3) possession of marijuana, a class B nonperson misdemeanor; (4) possession of drug paraphernalia, a class B nonperson misdemeanor; and (5) transportation of liquor in an open container, an unclassified misdemeanor.

Based on her claim that Deputy Dobler lacked reasonable suspicion to stop the car, Yeargin-Charles moved to suppress the evidence found in the search of her purse. At the hearing on the motion to suppress, Deputy Dobler testified that he observed the car's registration plate flapping in the wind, and he believed that violated the statute requiring the proper display of registration. On cross-examination, Deputy Dobler admitted that he had no trouble reading the license plate; the license plate was not cluttered by debris, foreign objects, or anything of the sort; and the license plate was affixed in the area where license plates are required to be on a car. The district court also received the dash-cam video of the traffic stop as evidence.

The State argued that the dash-cam video shows "the bottom of the tag oscillating in the wind" and that "only one bolt" was fastened to the car. In response to the district court's questions about the standard number of bolts on a car, the State argued that the "size of the bolts that go into a license plate and the rigidity of the plate, if you screw those bolts in and securely fasten them, it won't go anywhere."

The district court also asked the State if there was a violation, given that the statute mainly seeks to make sure that license plates are readable, and Deputy Dobler's testified that he could read the plate. The State responded that the statute's purpose is (1) "to be clear of obstruction and debris, dirt and stuff like that, to be legible" and (2) "to securely fasten the part [would] honestly be a traffic safety matter."

Yeargin-Charles' argument began by stating, "I know we all grew up in a rural community. I have seen trailers where the license plates have been fixed vertically rather than horizontally to the side because that's the way they fit the trailer. They are still clearly legible, and I don't think that's a violation." She countered the State's conclusion about the statute's purpose, arguing instead that the statute only requires legibility and visibility. She concluded that the license plate complied with the statute: it was affixed in a place more than 12 inches off the ground and it was not dirty. Yeargin-Charles also argued that the license plate was not falling off the car, the officer could read it, and if the plate "had been swinging, the officer wouldn't have been able to read it from the distance he was before he initiated this traffic stop."

In its order denying the suppression motion, the district court found two federal district court cases persuasive—*United States v. Velazquez*, 494 F. Supp. 2d 1250, 1252-53 (D. Kan. 2007), *aff'd* 349 Fed. Appx. 339 (10th Cir. 2009) (unpublished opinion); *United States v. Lopez-Estrada*, No. 10-40013-02-SAC, 2010 WL 2079813, at *4 (D. Kan. 2010) (unpublished opinion), *aff'd* 446 Fed. Appx. 81 (10th Cir. 2011) (unpublished opinion). The two cases addressed similar facts where the license plate was not securely fastened as required by K.S.A. 8-133(c), holding the officers had reasonable suspicion to initiate a traffic stop based on the violation. *Velazquez*, 494 F. Supp. 2d at 1252-53; *Lopez-Estrada*, 2010 WL 2079813, at *4. The district court adopted the reasoning and the findings of the federal district courts and denied Yeargin-Charles' motion to suppress.

5

*A jury finds Yeargin-Charles guilty on all charges.*

The jury found Yeargin-Charles guilty on all five charges. The district court imposed a suspended 20-month prison sentence with 18 months of probation.

*The appellant can raise this issue even though she was not driving the car.*

Fourth Amendment law is well settled. A traffic stop entails a seizure of the driver even though the purpose of the stop is limited and the resulting detention brief. *Brendlin v. California*, 551 U.S. 249, 255, 127 S. Ct. 2400, 168 L. Ed. 2d 132 (2007) (quoting *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S. Ct. 1391, 59 L. Ed. 2d 660 [1979]). It logically follows, then, that any passengers of a stopped vehicle also experience a restraint on their ability to freely move. This means that the police activity that normally amounts to intrusion on privacy and personal security does not normally distinguish between passenger and driver. *Brendlin*, 551 U.S. at 257. Basically, this means that Yeargin-Charles, as a passenger in a car stopped by police, can challenge the reasons for stopping the car in a motion to suppress evidence in her prosecution.

*Is a flapping license tag a good reason for a law enforcement officer to stop a car?*

Yeargin-Charles asserts that Deputy Dobler lacked adequate justification to initiate a traffic stop of the vehicle in which she was a passenger. She claims that Deputy Dobler's basis for the traffic stop—violation of K.S.A. 8-133(c)—was an impermissible mistake of law because the vehicle complied with that statute.

Deputy Dobler testified at the motion to suppress hearing that the reason he stopped the vehicle was its license plate was not properly secured under K.S.A. 8-133(c). He testified that the license plate was hanging by only one of four possible bolts and was

6

"flapping in the wind." Therefore, Deputy Dobler believed the vehicle to be out of compliance with the "securely fastened" provision of the statute.

*A closer look at the statute, K.S.A. 8-133(c).*

To resolve the issue raised by Yeargin-Charles, we must look to the plain language of the statute and decide the Legislature's intent for enacting K.S.A. 8-133(c). Under that section, it appears that the Legislature achieves two purposes, as reflected in two components.

*The first component*

"Every license plate shall at all times be securely fastened to the vehicle to which it is assigned, to prevent the plate from swinging, and at a height not less than 12 inches from the ground, measuring from the bottom of such plate." K.S.A. 8-133(c).

There is nothing hidden or subtle in this language. All license plates must be secured properly. Given this aim, the legislative intent in enacting this component seems to be directed at traffic safety. See, e.g., *Lopez-Estrada*, 2010 WL 2079813, at *4 (finding that the requirements of the first component in K.S.A. 8-133[c] "not only aids in identifying the vehicle, but also maintains the safety of the highways").

*The second component*

"The license plate shall be fastened in a place and position to be clearly visible, and shall be maintained free from foreign materials and in a condition to be clearly legible." K.S.A. 8-133(c).

7

What good is a license plate if you cannot read it? The second component's aim is to ensure both citizens and law enforcement may be able to easily identify vehicles. *State v. Beck*, No. 126,350, 2024 WL 1827298, at *9 (Kan. App. 2024) (unpublished opinion).

A recent panel of this court interpreted the provision in subsection (c) to impose three requirements for the display of license plates. These requirements are (1) the license plate must be "securely fastened to the vehicle," (2) the license plate must be "in a place and position to be clearly visible," and (3) the license plate must be "clearly legible." *Beck*, 2024 WL 1827298, at *9; K.S.A. 8-133(c).

While there appears to be no Kansas cases that address the unique facts at issue— the failure to securely fasten a license plate where visibility and legibility are not at issue—federal cases aid our analysis. See, e.g., *Velazquez*, 494 F. Supp. 2d at 1252-53; *Lopez-Estrada*, 2010 WL 2079813, at *4 .

In *Lopez-Estrada*, the Tenth Circuit Court of Appeals considered a traffic stop where an officer justified reasonable suspicion on K.S.A. 8-133(c), observing the vehicle's license plate hanging down on one side. The court held that the officer had reasonable suspicion that the vehicle was violating the provision requiring the plate to be securely fastened, "'so as to prevent the plate from swinging.'" 446 Fed. Appx. at 82-83.

The court found the defendant's argument unpersuasive that the trooper "lacked reasonable suspicion because the trooper did not see the license plate actually 'swinging'" and concluded that the Fourth Amendment "does not require so much." *Lopez-Estrada*, 446 Fed. Appx. at 83. Instead, the court noted that an "officer need not witness an ongoing violation of law to effect a traffic stop; he need only have a reasonable basis for thinking an infraction is taking or has taken place." 446 Fed. Appx. at 83. And under the facts of the case, the court found that "it was certainly reasonable for the trooper to think

a jury-rigged job of affixing a license plate might leave it poorly fastened and cause it to swing in violation of Kansas law." 446 Fed. Appx. at 83.

We find this reasoning persuasive here. This license tag was flapping in the wind and it was reasonable for the officer to stop the car.

Yeargin-Charles' argument ignores the plain language of the first component: "[e]very license plate shall at all times be *securely fastened* to the vehicle to which it is assigned, to *prevent the plate from swinging.*" K.S.A. 8-133(c). While both components relate to the visibility and legibility of a license plate, the first component also appears to reflect the legislative intent to ensure the safety of motor vehicles. Because Deputy Dobler saw the car's license plate moving and "flapping in the wind," he had reasonable suspicion to believe the car was in violation of K.S.A. 8-133(c).

We conclude that the officer had good reason to stop the car. Because it was a reasonable car stop, the grounds raised by the appellant to challenge the denial of her motion to suppress the contraband found in her purse are gone. The district court correctly denied the motion to suppress. We affirm the convictions.

Affirmed.