J-S79022-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| NOLTON THOMAS | |
| Appellant | No. 283 EDA 2014 |

Appeal from the Judgment of Sentence January 24, 2014
In the Court of Common Pleas of Delaware County
Criminal Division at No(s): CP-23-CR-0007304-2012

BEFORE:  ALLEN, OLSON and STRASSBURGER,* JJ.

MEMORANDUM BY OLSON, J.:                    **FILED MARCH 13, 2015**

Appellant, Nolton Thomas, appeals from the judgment of sentence entered on January 24, 2014.  We are constrained to vacate Appellant's convictions and remand for a new trial.

On August 22, 2012, Appellant was arrested and charged with possession of cocaine and possession of cocaine with the intent to deliver (hereinafter "PWID").  On April 29, 2013, Appellant filed a motion to suppress the physical evidence in his case.  As Appellant claimed, all of the evidence against him must be suppressed because "[Appellant] . . . was subjected to search and seizure without probable cause or reasonable suspicion" and because the search of the vehicle that Appellant was driving "far exceeded the permissible areas to be searched under the circumstances."  Appellant's Motion to Suppress, 4/29/13, at 1-2.

_____

*Retired Senior Judge assigned to the Superior Court.

On May 2, 2013, the trial court held an initial hearing on Appellant's suppression motion. During this initial hearing, the Commonwealth relied solely upon the testimony of City of Chester Police Officer Joshua Dewees, who was the officer that made the traffic stop of Appellant's vehicle. From Officer Dewees' testimony, the trial court made the following findings of fact:

> 1. On August 22, 2012[,] at approximately 5:01 p.m., Officer Joshua Dewees . . . was in [the] area of East 11[th] Street and Walnut Street[, in the City of Chester,] checking the area for a complaint of shots fired. [N.T. Suppression Hearing, 5/2/13, at 12-13.]
>
> 2. Officer [James] Fiore of the Chester City Police Department also responded to the complaint. [*Id.* at 16-17.]
>
> 3. While responding to the call, the officers were monitoring radio transmissions concerning the incident. [*Id.* at 16-17 and 39.]
>
> 4. A description was broadcast of the suspect being a black male wearing [a] red []shirt fleeing[1] the area on East 12[th] Street toward Potter Street.[2, 3] [*Id.* at 13, 28, and 31.]

_____

[1] We note that, during Officer Dewees' suppression hearing testimony, Officer Dewees alternatively testified that dispatch described the possible suspect as "fleeing" the area, "leaving" the area, and "walking away" from the area. *See* N.T. Suppression Hearing, 5/2/13, at 13 (testified that dispatch relayed "a description of a black male . . . seen leaving the area . . . north on Walnut towards 12[th] Street"); N.T. Suppression Hearing, 5/2/13, at 28-32 (testified that dispatch described the possible suspect as "fleeing the area"); N.T. Suppression Hearing, 5/2/13, at 31 (acknowledged that, during Appellant's preliminary hearing, Officer Dewees testified that the description was of the "possible shooter wearing [a red shirt] walking on West 12[th] Street").

> 5. Officer Fiore observed a suspect matching that description operating a maroon Volvo S80 with Pennsylvania Registration number [H_____6]. . . .[4]  [**_Id._** at 14-15, 16-17, and 46.]

_(Footnote Continued)_ ──────────────

[2] During the initial suppression hearing, Officer Dewees testified that dispatch informed him that the possible suspect was seen leaving the area "north on Walnut towards 12th Street."  N.T. Suppression Hearing, 5/2/13, at 13 and 31.  We note that, during the supplemental suppression hearing, Officer Dewees confirmed that he had earlier testified at Appellant's preliminary hearing and that, during Appellant's preliminary hearing, Officer Dewees had testified:  "[a] description was given to us by dispatch as a subject leaving the area wearing, I believe it was [a] red shirt headed westbound on 12th Street towards Potter Street right Walnut."  N.T. Suppression Hearing, 7/9/13, at 19.

[3] We have omitted a portion of the trial court's fourth numbered factual finding, as it is unsupported by the evidence of record.  Within the trial court's fourth numbered factual finding, the trial court declared that the broadcast description of the possible suspect was of "a black male wearing [a] red **t-shirt**."  Trial Court Opinion and Order, 6/7/13, at 1 (emphasis added).  However, no record evidence supports the trial court's declaration that the broadcast described the possible suspect as specifically wearing a "t-shirt."  Rather, the only evidence of record is that the broadcast description was of "a black male wearing a red **shirt**."  N.T. Suppression Hearing, 5/2/13, at 31 ("[o]kay, at this time, Officer [Fiore] reported by way of radio communication between the parties that the person wearing the red shirt was walking north on Walnut Street"); N.T. Suppression Hearing, 7/9/13, at 19 ("[a] description was given to us by dispatch as a subject leaving the area wearing, I believe it was [a] red shirt"); N.T. Trial, 11/20/13, at 50 ("at which time I [saw] the driver matching the description that was given out, a black male wearing a red shirt").

[4] We have omitted a portion of the trial court's fifth numbered factual finding, as it is unsupported by the evidence of record.  With respect to this factual finding, the trial court declared:

> 5. Officer Fiore observed a suspect matching that description operating a maroon Volvo S80 with Pennsylvania Registration number [H_____6] **turn onto Walnut Street**

_(Footnote Continued Next Page)_

- 3 -

6. Officer Fiore radioed Officer Dewees a description of a vehicle including the registration number that Officer Fiore believed the subject that matched the description from the shots fired was headed in Officer [Dewees'] direction. [*Id.*]

7. Officer Dewees spotted the vehicle and conducted a traffic stop in the 800 Block of Morton Avenue. [*Id.* at 17 and 69.]

8. Officer Dewees was unable to see into [the] vehicle because it had tinted windows. Officer Dewees ordered the driver to roll down the windows but received no response. [*Id.* at 19 and 50.]

9. At this time[,] Captain [Charles] Fell arrived on scene. He and Officer Dewees approached the vehicle and ordered the driver to exit the vehicle. [*Id.* at 19-21.]

10. The driver was identified as [Appellant]. There were no other occupants in the vehicle. [*Id.* at 19.]

11. It was determined that [Appellant] had a suspended driver's license. [*Id.* at 24-25.]

12. [Appellant] was patted down for weapons and none were found on his person. [*Id.* at 19-20.]

*(Footnote Continued)* ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

**from East 12th Street coming from [the] area of Potter Street**.

Trial Court Opinion and Order, 6/7/13, at 2 (emphasis added).

Officer Dewees was the only witness to testify during the initial and supplemental suppression hearings – and Officer Dewees never testified that Officer Fiore witnessed the vehicle "turn onto Walnut Street from East 12th Street coming from [the] area of Potter Street." *Id.* Rather, with respect to the direction of the vehicle at the time Officer Fiore spotted the car, the only evidence that exists was given at trial, by Officer Fiore. Moreover, at Appellant's trial, Officer Fiore specifically testified that, when he first spotted the vehicle, the vehicle was "travel[ing] **south** down the 1100 block." N.T. Trial, 11/20/13, at 50 (emphasis added).

13. Officer Dewees entered [the] driver's area of [the] vehicle to check for weapons. [*Id.* at 22.] This was the area where [Appellant] was sitting. [*Id.*]

14. Officer Dewees found a yellow "[I]ce [B]reakers [S]ours" candy container under [the driver's] seat. [*Id.*] When Officer Dewees moved the item he noticed it had more weight to it than an empty container[] but no moving objects inside as there would normally be. [*Id.* at 64-66.]

15. Officer Dewees looked in [the] container and found several bags containing white powder and [a] rock substance[, which he] believed [] to be cocaine. [*Id.* at 22-23.]

16. [Appellant] was arrested and placed into custody. [*Id.*]

17. Captain Fell determined [Appellant's] vehicle posed public safety and efficient movement of traffic concerns and ordered it towed. [*Id.* at 25.]

18. The Chester City Police Department towing procedures require that all impounded vehicles be routinely secured and the contents inventoried. [*Id.* at 25 and 91.]

Trial Court Opinion and Order, 6/7/13, at 1-3 (some internal capitalization omitted).

Officer Dewees testified that, before he made the initial traffic stop of Appellant's vehicle, he did not personally see the driver of the vehicle. Therefore, Officer Dewees acknowledged that, "at the time [he] stopped [Appellant's] vehicle, [he was] not sure if [Appellant] . . . fit the description of the individual" that was given to dispatch. N.T. Suppression Hearing, 5/2/13, at 48. Instead, Officer Dewees testified, he stopped Appellant's vehicle because Officer Fiore had told him to stop a maroon Volvo S80 with Pennsylvania Registration number "H_____6" – and Officer Fiore "indicated

- 5 -

[to Officer Dewees that the vehicle] had a person matching the description" of the possible suspect.[5] *Id.* at 46.

On June 7, 2013, the trial court denied Appellant's motion to suppress. However, on June 17, 2013, Appellant filed a motion to reconsider the order denying his motion to suppress. Within Appellant's motion to reconsider, Appellant first claimed that the initial stop of his vehicle was unconstitutional because "the description [of the possible suspect] was impermissibly vague." Appellant's Motion to Reconsider, 6/7/13, at 1. Appellant also claimed that he was entitled to relief because Officer Dewees "exceeded the scope of any permissible search under the circumstances." *Id.* at 2.

By order entered June 28, 2013, the trial court granted Appellant's reconsideration motion. Trial Court Order, 6/28/13, at 1. The trial court thus vacated its order denying Appellant's motion to suppress and scheduled a second evidentiary hearing on the suppression motion. Further, as the trial court's order declared, the second suppression hearing was to be a supplemental hearing where "either [Appellant] or the Commonwealth" could

---

[5] We note that, during the initial suppression hearing, Officer Dewees testified that the area in which he finally effectuated the traffic stop – "the 800 Block of Morton Avenue" – constituted a "high crime area." N.T. Suppression Hearing, 5/2/13, at 69-73. However, there is no record evidence that the area in which Appellant was originally spotted by Officer Fiore constituted a "high crime area."

"present additional evidence or argument" on whether suppression was or was not warranted. *Id.*

On July 9, 2013, the trial court held the supplemental suppression hearing and, during the hearing, the Commonwealth presented additional testimony from Officer Dewees. Specifically, Officer Dewees testified that Appellant was not the registered owner of the Volvo S80 automobile that was involved in the August 22, 2012 traffic stop. Instead, the registered owner of the vehicle was an individual named Lashawn Smith. N.T. Suppression Hearing, 7/9/13, at 17. Appellant presented no evidence that he owned the vehicle or that the registered owner had given him permission to use the vehicle on the day in question. *See id.* at 12-47.

Further, during the supplemental suppression hearing, Officer Dewees testified that, "[p]rior to getting behind the vehicle in which [Appellant] was [] driving," Officer Dewees was able to determine that shots were fired from the intersection at 11th and Walnut Streets – and Officer Dewees testified that he was able to determine that shots were fired in this specific area "[b]ased off the evidence found there, shell casings." *Id.* at 22-23.

The trial court denied Appellant's motion to suppress on August 9, 2013. As is relevant to the current appeal, the trial court explained that it denied the suppression motion because it determined that "Officer Dewees had reasonable suspicion to make [the initial] traffic stop of [Appellant's vehicle]" and Appellant failed to demonstrate that he possessed "an

expectation of privacy in the area searched." Trial Court Opinion, 8/9/13, at 6-7.

Appellant proceeded to a jury trial. During this jury trial, the Commonwealth presented testimony from Officer Fiore. As Officer Fiore testified, on August 22, 2012, he "received notice of an emergency situation in the area of East 11th and Walnut Street[s]" in the City of Chester. Further, Officer Fiore testified that dispatch informed him that the possible suspect was a black male "wearing a red shirt" and that the possible suspect was "fleeing **north** on Walnut Street in the 1100 block." N.T. Trial, 11/20/13, at 48 and 49 (emphasis added).

Officer Fiore testified that he arrived at the 1100 block of Walnut Street less than one minute after the dispatch and that, when he reached the 1100 block of Walnut Street, he exited his patrol car and began to investigate. *Id.* at 49-50. According to Officer Fiore, at some unspecified time "during the course of that investigation," he observed a maroon Volvo automobile "travel[ing] **south** down the 1100 block [by a] . . . driver matching the description that was given out, a black male wearing a red shirt." *Id.* at 50 (emphasis added). Officer Fiore testified that he radioed to officers in the vicinity that he wanted to have the maroon Volvo automobile pulled over; Officer Fiore testified that he later observed that Officer Dewees had pulled over the particular vehicle that he had spotted. *Id.* at 51-52.

Officer Dewees also testified at Appellant's trial. As Officer Dewees testified: following Officer Fiore's radio alert, Officer Dewees observed the

maroon Volvo being driven "south on Chestnut Street;" Officer Dewees pursued the vehicle and initiated a vehicle stop of the automobile on "the 800 block of Morton Avenue;" after stopping the vehicle, Officer Dewees "activated the [public address] system [on his patrol car] and asked the driver of the vehicle [(who was later identified as Appellant)] to roll down the windows;" after Appellant refused Officer Dewees' third demand to roll down the windows, Officer Dewees and Captain Fell approached the driver's side door and removed Appellant from the vehicle; the officers patted Appellant down for weapons; following the pat-down, Officer Dewees "went [into the vehicle] and [] checked the area [that had been within Appellant's] wing span;" Officer Dewees found an Ice Breakers Sours candy container under the driver's seat of the vehicle; when Officer Dewees opened the container, Officer Dewees discovered "five zip[-]style bags with suspected cocaine and two sandwich bags with suspected cocaine;" Officer Dewees took Appellant into custody and, during the search incident to arrest, Officer Dewees discovered 25 $20.00 bills and six $1.00 bills (totaling $506.00) on Appellant's person; and, the total weight of the cocaine in the bags was 8.9 grams. *Id.* at 64, 65-72, 76-78, and 180-181.

Moreover, during Appellant's trial, the Commonwealth presented the testimony of Lieutenant Michael Boudwin, whom the trial court accepted as an expert in the field of drug and drug investigations. *Id.* at 190-191. As Lieutenant Boudwin testified, the cocaine that was found in the Ice Breakers

Sours container was possessed with the intent to deliver and had a total street value of approximately $500.00. *Id.* at 192 and 195.

At the conclusion of Appellant's trial, the jury found Appellant guilty of possession of cocaine and PWID.[6]   N.T. Trial, 11/21/13, at 142-143. Further, the jury specifically found that the cocaine Appellant possessed with the intent to distribute weighed between two and ten grams. *Id.* at 143.

On January 24, 2014, the trial court sentenced Appellant to the mandatory minimum term of three to ten years in prison, pursuant to 18 Pa.C.S.A. § 7508(a)(2)(i), as Appellant was convicted of possession of cocaine with the intent to deliver where "the aggregate weight of the compound or mixture containing the substance involved [was] at least 2.0 grams and less than 10 grams" and, at the time of sentencing, Appellant "ha[d] been convicted of another drug trafficking offense."   18 Pa.C.S.A. § 7508(a)(2)(i); N.T. Sentencing, 1/24/14, at 32 and 35.

Appellant filed a timely notice of appeal and Appellant now raises the following claims to this Court:[7]

> [1.] Whether the trial court erred in denying [Appellant's] suppression motion[?]

---

[6] 35 P.S. § 780-113(a)(16) and (30), respectively.

[7] The trial court ordered Appellant to file and serve a concise statement of errors complained of on appeal, pursuant to Pennsylvania Rule of Appellate Procedure 1925(b).  Appellant complied with the trial court's order and, within his Rule 1925(b) statement, Appellant listed the claims he currently raises on appeal.

[2.] Whether the trial court had sufficient evidence to present this case to the jury and if the trial court erred in not granting [Appellant's] motion on weight of the evidence[?]

[3.] Whether the trial court committed error during the trial which prejudiced [Appellant] and contributed to his guilty verdict which requires reversal for [a] new trial[?]

[4.] Whether the trial court entered an illegal sentence as to the minimum mandatory sentence for subsequent conviction for [PWID] in violation of [**Alleyne v. United States**, ___ U.S. ___, 133 S.Ct. 2151 (2013)] and if it further abused its discretion in sentencing [Appellant] to a lengthy tail[?]

Appellant's Brief at 4.

At the outset, Appellant contends that the trial court erred when it denied his motion to suppress. In particular, Appellant claims that the trial court should have suppressed the evidence against him, as both the initial stop and the subsequent search of his vehicle were unconstitutional. We are constrained to find that the initial stop of Appellant's vehicle was not supported by reasonable suspicion. As such, we are compelled to conclude that Appellant was subjected to an illegal seizure of his person and that the fruits of this illegal seizure must be suppressed. We must, therefore, vacate Appellant's convictions and remand for a new trial.

"Once a motion to suppress evidence has been filed, it is the Commonwealth's burden to prove, by a preponderance of the evidence, that the challenged evidence was not obtained in violation of the defendant's rights." **Commonwealth v. Wallace**, 42 A.3d 1040, 1047-1048 (Pa.

Super. 2012) (*en banc*); **see also** Pa.R.Crim.P. 581(H). With respect to an

appeal from the denial of a motion to suppress, our Supreme Court has

declared:

> Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. When reviewing the ruling of a suppression court, we must consider only the evidence of the prosecution and so much of the evidence of the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error.

**Commonwealth v. Eichinger**, 915 A.2d 1122, 1134 (internal citations

omitted).[8] "It is within the suppression court's sole province as factfinder to

---

[8] On October 30, 2013, our Supreme Court decided **In re L.J.**, 79 A.3d 1073, 1087 (Pa. 2013). In **L.J.**, our Supreme Court held that our scope of review from a suppression ruling is limited to the evidentiary record that was created at the suppression hearing. **In re L.J.**, 79 A.3d 1073, 1087 (Pa. 2013). Prior to **L.J.**, this Court routinely held that, when reviewing a suppression court's ruling, our scope of review included "the evidence presented both at the suppression hearing and at trial." **See Commonwealth v. Charleston**, 16 A.3d 505, 516 (Pa. Super. 2011), *quoting* **Commonwealth v. Chacko**, 459 A.2d 311, 317 n.5 (Pa. 1983). **L.J.** thus narrowed our scope of review of suppression court rulings to the evidence presented at the suppression hearing.

However, **L.J.** declared that the new procedural rule of law it announced was not retroactive, but was rather "prospective generally" – meaning that the rule of law was applicable "to the parties in the case and [to] all litigation commenced thereafter." **In re L.J.**, 79 A.3d at 1089 n.19. Since the litigation in the current case commenced before **L.J.** was filed, the new procedural rule of law announced in **L.J.** does not apply to the case at bar. **See id.**

pass on the credibility of witnesses and the weight to be given their testimony." *Commonwealth v. Gallagher*, 896 A.2d 583, 585 (Pa. Super. 2006).

"The Fourth Amendment to the [United States] Constitution and Article I, Section 8 of [the Pennsylvania] Constitution protect citizens from unreasonable searches and seizures." *Commonwealth v. McAdoo*, 46 A.3d 781, 784 (Pa. Super. 2012). To safeguard our right to be free from unreasonable searches and seizures, "courts require police to articulate the basis for their interaction with citizens in [three] increasingly intrusive situations." *McAdoo*, 46 A.3d at 784. Our Supreme Court has categorized these three situations as follows:

> The first category, a mere encounter or request for information, does not need to be supported by any level of suspicion, and does not carry any official compulsion to stop or respond. The second category, an investigative detention, derives from *Terry v. Ohio*[9] and its progeny: such a detention is lawful if supported by reasonable suspicion because, although it subjects a suspect to a stop and a period of detention, it does not involve such coercive conditions as to constitute the functional equivalent of an arrest. The final category, the arrest or custodial detention, must be supported by probable cause.

*Commonwealth v. Smith*, 836 A.2d 5, 10 (Pa. 2003).

The parties agree that, when the police initially stopped Appellant's vehicle, the police did not have probable cause to believe that Appellant had

---

[9] *Terry v. Ohio*, 392 U.S. 1 (1968).

- 13 -

committed a crime. **See** N.T. Suppression Hearing, 5/2/13, at 46-47 (Officer Dewees testified that, prior to stopping Appellant's vehicle, Officer Dewees "did not observe . . . [the vehicle] commit[] any moving violations"). Moreover, Appellant does not challenge the trial court's determination that the initial vehicle stop constituted an investigatory detention; Appellant claims only that the initial traffic stop – and the resulting seizure of his person – was unsupported by reasonable suspicion. Appellant's Brief at 17; **see also Commonwealth v. Cruz**, 21 A.3d 1247, 1250 (Pa. Super. 2011) ("the forcible stop of a vehicle constitutes an investigative detention such that there must be reasonable suspicion that illegal activity is occurring"); **Brendlin v. California**, 551 U.S. 249, 263 (2007) (holding that a vehicle passenger was "seized from the moment [the driver's] car came to a halt on the side of the road"). We agree with Appellant.

We have explained:

> Our Supreme Court has mandated that law enforcement officers, prior to subjecting a citizen to an investigatory detention, must harbor at least a reasonable suspicion that the person seized is then engaged in unlawful activity. The question of whether reasonable suspicion existed at the time of an investigatory detention must be answered by examining the totality of the circumstances to determine whether the officer who initiated the stop had a particularized and objective basis for suspecting the individual stopped. Thus, to establish grounds for reasonable suspicion, the officer must articulate specific observations which, in conjunction with reasonable inferences derived from those observations, led him reasonably to conclude, in light of his experience, that

- 14 -

criminal activity was afoot and that the person he stopped was involved in that activity.

Although a police officer's knowledge and length of experience weigh heavily in determining whether reasonable suspicion existed, our Courts remain mindful that the officer's judgment is necessarily colored by his or her primary involvement in the often competitive enterprise of ferreting out crime. Therefore, the fundamental inquiry of a reviewing court must be an objective one, namely, whether the facts available to the officer at the moment of the intrusion warrant a man of reasonable caution in the belief that the action taken was appropriate. This inquiry will not be satisfied by an officer's hunch or unparticularized suspicion.

***Commonwealth v. Reppert***, 814 A.2d 1196, 1203-1204 (Pa. Super. 2002) (*en banc*) (internal quotations, citations, corrections, and emphasis omitted).

"To have reasonable suspicion, police officers need not personally observe the illegal or suspicious conduct, but may rely upon the information of third parties, including 'tips' from citizens." ***Commonwealth v. Lohr***, 715 A.2d 459, 461 (Pa. Super. 1998). With respect to these third-party "tips," we have held:

Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability. Both factors – quantity and quality – are considered in the "totality of the circumstances – the whole picture," that must be taken into account when evaluating whether there is reasonable suspicion. Thus, if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were reliable.

When the underlying source of the officer's information is an anonymous call, the tip should be treated with particular

suspicion. However, a tip from an informer known to the police may carry enough indicia or reliability for the police to conduct an investigatory stop, even though the same tip from an anonymous informant would likely not have done so.

Indeed, identified citizens who report their observations of criminal activity to police are assumed to be trustworthy, in the absence of special circumstances, since a known informant places himself at risk of prosecution for filing a false claim if the tip is untrue, whereas an unknown informant faces no such risk. When an identified third party provides information to the police, we must examine the specificity and reliability of the information provided. The information supplied by the informant must be specific enough to support reasonable suspicion that criminal activity is occurring. To determine whether the information provided is sufficient, we assess the information under the totality of the circumstances. The informer's reliability, veracity, and basis of knowledge are all relevant factors in this analysis.

*Commonwealth v. Barber*, 889 A.2d 587, 593-594 (Pa. Super. 2005) (internal quotations and citations omitted).

Further, we observe that police may conduct "a vehicle stop based upon a radio bulletin." *Id.* at 594 (internal quotations and citations omitted). However, for such a stop to be valid:

someone in the police department must possess sufficient information to give rise to reasonable suspicion. The officer with the reasonable suspicion, usually the dispatcher, need not convey all of this background information to the officer who actually effectuates the stop. Thus, the police may justify the search by presenting sufficient evidence at the suppression hearing that someone in the chain of command had reasonable suspicion before the stop, even if the arresting officer did not.

This is not to say, however, that the Commonwealth may generate information giving rise to reasonable suspicion for

the first time after the stop took place. In other words, even though the evidence of reasonable suspicion may be presented at a later suppression hearing, the police must have this evidence prior to the stop itself.

*Id.* (internal quotations and citations omitted).

Finally, we note that, since reasonable suspicion depends upon the totality of the circumstances, the facts and circumstances giving rise to (or failing to give rise to) reasonable suspicion will vary depending upon the specific facts of the case. In the case at bar, the facts of this case reveal that a number of different factors are relevant to our reasonable suspicion analysis. These factors include: the source of the original tip (*i.e.* whether the source of the tip was an anonymous caller or was a known caller or victim of the crime); the source of the tipster's knowledge; the specificity of the tip; the investigating officer's training and experience; the physical proximity of the individual seized to the scene of the crime or the location given by the tipster; the temporal proximity from the time of the crime to the time of the tipster's call; the temporal proximity from the time of the receipt of the information to the time the officer came upon the individual seized; whether the tip was predictive of the individual's future behavior; whether, before the seizure, the officer witnessed the individual act suspiciously or irregularly or whether the officer witnessed the individual act normally; the time and place of the stop; police corroboration of the tip; and, police corroboration of any alleged criminal activity.

Here, the Commonwealth's evidence was insufficient to prove that the initial stop of Appellant's vehicle was supported by reasonable suspicion.

Therefore, we must conclude that the Commonwealth did not satisfy its "burden [of] prov[ing], by a preponderance of the evidence, that the challenged evidence was not obtained in violation of the defendant's rights." **Wallace**, 42 A.3d at 1047-1048. The trial court thus erred when it denied Appellant's motion to suppress.

In the case at bar, the Commonwealth relied solely upon the testimony of Officers Dewees and Fiore to oppose Appellant's suppression motion. However, Officers Dewees and Fiore were only able to testify that **dispatch had informed them** that there was "a complaint of shots fired . . . in [the] area of East 11th Street and Walnut Street" and that **dispatch had informed them** that the possible suspect was "a black male wearing a red shirt" who was seen fleeing the area either "north on Walnut Street" or "on East 12th Street toward Potter Street." Even assuming that the dispatcher's source of knowledge originated from a citizen's 911 call, the Commonwealth did not introduce the audio recording of the 911 call, a transcription of the 911 call, a report of the 911 call, or the testimony of the dispatcher. Therefore, there is no evidence as to: the name of the tipster; the telephone number from which the tipster placed the call; the source of the tipster's knowledge regarding the "shots fired" (*i.e.* whether the tipster personally witnessed the shots being fired or whether the tipster heard another person speak of shots being fired); the time at which the shots were fired; or, the time at which the possible suspect was seen fleeing the area.

Further, even assuming that the source of the dispatcher's knowledge originated from a tipster's telephone call to 911, the tipster here was anonymous. As explained above, under our precedent, anonymous tips of criminality have "a relatively low degree of reliability" and must "be treated with particular suspicion." We note that, in this case, Officers Fiore and Dewees must be commended for not only arriving at the scene so soon after they were dispatched but for also "treating [the] tip with particular suspicion": indeed, Officer Dewees testified that, prior to the vehicle stop, the officers investigated the scene and discovered shell casings on the 1100 block of Walnut Street. In doing so, Officers Fiore and Dewees were able to partially corroborate the tipster's report that shots were fired at that location.

However, even though the officers were able to partially corroborate the report that criminal activity occurred at the particular location, the officers did not possess reasonable suspicion in this case to stop Appellant. This is because no one in the chain of command – neither the officers nor dispatch – had reasonable suspicion to believe that **Appellant** was involved in the criminal activity. Indeed, with respect to the remaining factors that we have identified as relevant to our reasonable suspicion analysis, we observe:

- The physical description of the possible suspect in this case – a "black male wearing a red shirt" – was extraordinarily vague and all-

encompassing and could have described any number of men in the vicinity.

- As was already explained, since we do not know the source of the tipster's knowledge, there is no evidence as to when the alleged shooting occurred; therefore, there is no evidence as to whether Appellant's physical proximity to the scene was also temporally proximate to the crime.

- Even though Officer Fiore testified that he arrived at the 1100 block of Walnut Street "less than one minute" after the dispatch, Officer Fiore did not specifically testify as to when he first observed Appellant; instead, Officer Fiore merely testified that he observed Appellant "during the course of [his] investigation." Thus, there is no evidence regarding the temporal proximity from the time of the dispatch to the time Officer Fiore first viewed Appellant.

- The tip was not predictive of Appellant's future behavior.

- Officer Fiore was unable to corroborate the tipster's statement that the possible suspect was fleeing the area either "north on Walnut Street" or "on East 12th Street toward Potter Street."

- The tipster did not describe the possible suspect as driving a vehicle and, when Officer Fiore first saw Appellant, Appellant was driving a vehicle.

- When Officer Fiore first saw Appellant, Appellant was neither traveling "north on Walnut Street" nor "on East 12th Street toward Potter

Street." Instead, Appellant was in a vehicle, "travel[ing] **south** down the 1100 block."

- There is no evidence that Appellant behaved suspiciously or irregularly prior to the vehicle stop.[10]

- There is no evidence that, when Officer Fiore first viewed Appellant, Appellant was in a high crime area.

From the above, after viewing the totality of the circumstances in this case, we must conclude that the police did not have the necessary reasonable suspicion to effectuate a traffic stop of the vehicle Appellant was driving, as no one "in the chain of command had reasonable suspicion before the stop" to believe that **Appellant**, in particular, was "involved in [the reported criminal] activity." *See Reppert*, 814 A.2d at 1203-1204; *Barber*, 889 A.2d at 594. Moreover, since the police discovered the cocaine as a

_____

[10] Within the trial court's opinion, the trial court states that "[w]hen [Appellant] saw Officer Fiore[, Appellant] began to back up his car and go down a side street." Trial Court Opinion, 7/7/14, at 1-2. The trial court's statement is unsupported by the evidence of record. During trial, Officer Fiore testified that, while he was investigating the report of "shots fired," Officer Fiore observed Appellant driving a vehicle and traveling towards him. N.T. Trial, 11/20/13, at 50. Officer Fiore testified that, after he saw Appellant, he observed Appellant "back up and . . . take another side street over." *Id.* However, Officer Fiore never testified that he believed Appellant saw him or that Appellant's actions were either suspicious or irregular; indeed, there is no evidence as to whether Officer Fiore was in uniform or in plain clothes at the time he first observed Appellant. Therefore, the trial court's statement that "[Appellant] saw Officer Fiore" and the trial court's implication that Appellant's subsequent action was suspicious are unsupported by the record.

direct result of the illegal seizure of Appellant's person, the cocaine constitutes the fruit of this illegal seizure.[11]  The trial court thus erred when it denied Appellant's motion to suppress.[12]

_____

[11] It is of no moment to our holding that Appellant might have failed to demonstrate that he had an expectation of privacy in the vehicle or in unlabeled, unclaimed containers within the vehicle.  This is because the initial seizure of Appellant's person was illegal.  Therefore, the evidence obtained pursuant to the illegal seizure of Appellant's person was tainted and must be suppressed.  *See Brendlin*, 551 U.S. at 263 (holding that a vehicle passenger was "seized from the moment [the driver's] car came to a halt on the side of the road"); *see also Brendlin*, 551 U.S. at 259, *quoting* 6 W. LaFave, SEARCH AND SEIZURE § 11.3(e) at 194, 195, and n.227 (4th ed. 2004 and Supp 2007) (noting that, even though a passenger does not have an expectation of privacy in another person's vehicle, "[i]f either the stopping of the car, the length of the passenger's detention thereafter, or the passenger's removal from it are unreasonable in a Fourth Amendment sense, then surely the passenger has standing to object to those constitutional violations and to have suppressed any evidence found in the car which is their fruit").

[12] On appeal, Appellant also claims that the evidence was insufficient to support his convictions because "the [C]ommonwealth did not sufficiently establish [that Appellant] personally or constructively[] possessed the drug items found under the driver seat."  Appellant's Brief at 18.  This claim is meritless.  As the trial court ably explained, when the evidence is viewed in the light most favorable to the Commonwealth, the evidence is clearly sufficient to prove that Appellant constructively possessed the cocaine that was found underneath his seat:

> The jury as the fact finder determined that [Appellant] constructively possessed [] the cocaine found in the yellow "[I]ce [B]reakers [S]ours" candy container under [the] driver seat.  [Appellant] was the operator of the vehicle.  There were no other occupants of the vehicle.  The drugs were easily accessible to [Appellant]. . . .  When [Appellant's] vehicle was stopped he did not obey Officer [Dewees'] command to exit the vehicle[; instead, Appellant] stalled and had to be removed from the vehicle. . . .

*(Footnote Continued Next Page)*

We vacate Appellant's convictions, reverse the trial court's order denying Appellant's suppression motion, and remand for a new trial.[13]

Judgment of sentence vacated. Case remanded. Jurisdiction relinquished.
Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/13/2015

(Footnote Continued) _____

> The [Commonwealth also presented the following evidence:] Lieutenant Boudwin's expert testimony regarding how the drugs were packaged[;] the amount of money found on [Appellant;] the fact that [Appellant] was driving a car that was not registered to him[; and, Appellant] was arrested in the area of the largest open air drug market in Delaware County. . . .
>
> [Viewed] in the light most favorable to the Commonwealth[, this evidence] was sufficient to sustain [Appellant's] conviction for [simple possession and PWID].

Trial Court Opinion, 7/7/14, at 7.

We agree with the trial court's cogent analysis and conclude that Appellant's sufficiency of the evidence claim fails.

[13] Given our disposition, Appellant's remaining claims are moot.