Filed 5/21/26  Urias v. Dept. of Motor Vehicles CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| CAYETANO SALDANA URIAS, | F089406 |
| Plaintiff and Appellant, | (Super. Ct. No. BCV-24-100410-TSC) |
| v. | |
| DEPARTMENT OF MOTOR VEHICLES, | **OPINION** |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Kern County.  Thomas S. Clark, Judge.

Middlebrook & Associates, Richard O. Middlebrook and Gabrielle Burnett for Plaintiff and Appellant.

Rob Bonta, Attorney General, Chris A. Knudsen, Assistant Attorney General, Gabrielle H. Brumbach, Thomas F. Cochrane and Linda G. Ronan, Deputy Attorneys General, for Defendant and Respondent.

-ooOoo-

This appeal involves the suspension of appellant Cayetano Saldana Urias's driver's license following an administrative per se (APS) hearing. An administrative hearing officer (AHO) for respondent Department of Motor Vehicles (DMV) concluded that Urias had driven his vehicle with a blood-alcohol content (BAC) of 0.08 or greater and upheld the suspension of his driver's license. The AHO's decision was subsequently upheld by the Kern County Superior Court. In this appeal, Urias contends that: (1) his due process rights were violated because the AHO acted as the advocate for the DMV and the adjudicator; (2) his arrest was unlawful because reasonable suspicion did not support his initial seizure; and (3) alternatively, even if reasonable suspicion existed for the initial seizure, his continued seizure was not supported by reasonable suspicion. We affirm.

## APS SYSTEM

In California, the DMV must immediately suspend the driver's license of a person who is driving with a BAC of 0.08 or more. (Veh. Code, § 13353.2, subd. (a)(1).)[1] However, drivers have a right to an administrative hearing, that is an APS hearing, before the suspension of a license takes effect. (*Cisneros v. Department of Motor Vehicles* (2024) 104 Cal.App.5th 381, 408.) At the APS hearing, an AHO determines: whether an arresting officer had reasonable cause to believe the driver was driving under the influence, whether the driver was lawfully arrested, and whether the driver was driving with a BAC of 0.08 or greater. (*Evans v. Gordon* (2019) 41 Cal.App.5th 1094, 1101.) The Legislature crafted the APS laws to address the time lag that often occurs between an arrest and a conviction for driving while intoxicated or with a prohibited BAC level. (*MacDonald v. Gutierrez* (2004) 32 Cal.4th 150, 155.) As a result, APS hearings are intended to be expedited (*Lake v. Reed* (1997) 16 Cal.4th 448, 455, fn. 2 (*Lake*)), and the rules governing the admissibility of evidence are relaxed. (*McDonald*, at p. 159.) The DMV bears the burden at the APS hearing of demonstrating that the driver drove with a

---

[1]     All further statutory references are to the Vehicle Code.

BAC of 0.08 or more.  (*Gerwig v. Gordon* (2021) 61 Cal.App.5th 59, 65 (*Gerwig*); *Petricka v. Department of Motor Vehicles* (2001) 89 Cal.App.4th 1341, 1348.) Additionally, since April 2022, the DMV has been enjoined from requiring that AHO's at APS hearings act as both the adjudicator and the DMV's advocate.  (*California DUI Lawyers Association v. Department of Motor Vehicles* (2022) 77 Cal.App.5th 517, 530– 533, 538 (*CDLA*)).  The injunction was necessary because DMV policy mandated that AHO's act as both the adjudicator and the DMV's advocate, which created a constitutionally intolerable probability of bias and thus, deprived drivers of their due process right to a constitutionally impartial adjudicator.  (*Id*. at pp. 526, 532–533 & fn. 5.)

## PROCEDURAL BACKGROUND

On September 30, 2023, Urias was arrested for violation of section 23152, subdivisions (a) and (b) (driving under the influence of alcohol with a BAC of 0.08 or more).

On January 18, 2024, an APS hearing was conducted pursuant to section 13557.

On January 19, 2024, the AHO found that Urias had been lawfully arrested and had driven with a BAC of 0.08 or more.  As a result, Urias's license was suspended pursuant to sections 13353.2 and 13353.3.

On February 6, 2024, Urias filed an administrative petition for writ of mandate with the Kern County Superior Court to challenge the suspension determination.

On October 11, 2024, the trial court denied the writ.

On February 27, 2025, Urias filed a notice of appeal.

## FACTUAL BACKGROUND

On September 30, 2023, at 3:45 a.m., Shafter Patrol Officer E. Davalos was patrolling in the City of Shafter.[2]  As Davalos approached the intersection of Mannel

---

[2]    Pursuant to rule 8.90, we refer to some persons by their initials.  No disrespect is intended.

Avenue and Handel Avenue, he saw a gray SUV at the further intersection of Mannel and Fresno Avenue. The gray SUV did not come to a complete stop at the four-way signed intersection of Mannel and Fresno but sped through the intersection at a high rate of speed, which was a violation of section 22450, subdivision (a).

Davalos drove towards the intersection of Mannel and Fresno and then turned down Fresno, where he saw the gray SUV's taillight about a quarter of a mile ahead of him. As Davalos was approaching the gray SUV, it turned down Eckman Street. When Davalos turned down Eckman, he lost sight of the gray SUV. Davalos turned on Handel to search for the gray SUV.

At the intersection of Handel and Tamera Avenue, Davalos "spotted a pair of headlights and presumed it to be the same SUV [he] saw moments ago." The vehicle drove to Bree Drive, which ended in a cul-de-sac. Davalos followed and turned down Bree.

As Davalos drove down Bree, he saw an SUV in the process of making a three-point turn. After making the turn, the SUV drove towards Davalos. Because it was dark in the early morning hours and there was low visibility, in order to get a better view, Davalos activated his patrol vehicle's " 'scene' white lights."[3] The SUV then came to a stop next to Davalos's patrol vehicle. The SUV was a gray Acura MDX.

Davalos spoke to the driver of the gray SUV, who was later identified as Urias, at approximately 3:47 a.m. Davalos asked if Urias was the person he saw speed through the intersection of Mannel and Fresno, to which Urias answered, " 'No.' " Davalos then asked what Urias was doing, and Urias responded that he came from Wasco to visit his girlfriend, who lived on Kern Street in Shafter. Because Kern was about a quarter of a

---

[3]     "Scene white lights" appear to be additional lights on a patrol vehicle that are used to help illuminate an area; they are not the traditional red and blue lights used to effectuate a stop. (E.g., *State v. Decanini-Hernandez* (Iowa Ct.App. 2021) 957 N.W.2d 724.)

mile away from where Urias and Davalos were stopped, Davalos believed that Urias was lost. However, while he spoke with Urias, Davalos noticed that Urias had red watery eyes, slow, slurred speech, and a flushed and sweaty face, even though it was only around 65 degrees outside. Based on these observations, Davalos suspected that Urias might be driving under the influence of alcohol.

Davalos then ordered Urias to turn off the SUV, and Urias complied. Davalos pulled his patrol vehicle behind the gray SUV, exited, and approached Urias. When he was close to Urias, Davalos smelled the strong odor of alcohol coming from the gray SUV. Davalos began to conduct a DUI investigation, including administering field sobriety tests. Davalos ultimately arrested Urias for DUI at approximately 4:03 a.m. Davalos administered a preliminary alcohol screening test at 4:16 a.m., which yielded a BAC of 0.094. Davalos then administered two breath tests at 4:36 a.m. and 4:38 a.m. The two tests yielded BAC levels of 0.084 and 0.083, respectively.

*APS Hearing & Decision*

On January 18, 2024, an APS hearing was held. Prior to the hearing, Urias received a notice from the DMV that informed him of his right to provide evidence at the APS hearing and that the AHO "will develop the facts and render a final decision on your matter but does not advocate on behalf of the [DMV]. The [AHO] will ensure that all relevant evidence is considered. The [AHO] will examine and admit the DMV's official records, [as] well as the official records of the agency that arrested you." Consistent with this pre-hearing advisement, the AHO informed Urias at the hearing that he (the AHO) would be: "acting as a neutral factfinder," was "prohibited from and will not act as an advocate for the DMV or law enforcement," and was to "review the evidence as provided, ask clarifying questions of witnesses, if necessary, make legal rulings and determinations under the relevant statutes as necessary." The AHO then explained that there were three issues for the hearing: (1) did Davalos have reasonable cause to believe

5.

Urias was driving under the influence; (2) was Urias lawfully arrested; and (3) was Urias driving with a BAC of 0.08 or more?

After explaining the issues to be adjudicated, Urias's counsel objected that the structure of the APS hearing violated due process as explained by *CDLA*. The AHO stated that he did not have the statutory authority to rule on the objection. The AHO then introduced as exhibits Davalos's unsworn police report, a sworn DMV investigative report (the DS-367 form), and Urias's DMV driving record. Urias objected to the DS-367 form and Davalos's police report in part as hearsay. The AHO overruled Urias's objection and admitted all three documents as exhibits. The AHO admitted no other evidence and invited Urias to present his case. Urias's counsel did not call any witnesses but did argue that Urias was unlawfully detained because Davalos was unable to confirm that Urias ran the stop sign. Counsel particularly noted that Urias was driving a gray sedan and not a gray SUV.[4] After Urias's counsel finished her argument, the AHO concluded the hearing.

On January 19, 2024, the AHO issued a written decision confirming the suspension of Urias's license. The AHO determined Urias was lawfully stopped, reasonable cause existed for Urias's arrest, and Urias drove with a BAC of 0.08 or more. In part, the AHO more specifically determined that Davalos observed Urias running a stop sign and that Davalos had reasonable suspicion to contact Urias because the vehicle he was driving matched the description of the vehicle that Davalos had observed.

*Trial Court Proceedings*

On February 6, 2024, Urias filed a petition for peremptory writ of mandamus with the Kern County Superior Court to set aside the suspension of his license. A hearing on the writ was held on September 20, 2024, and a decision was issued on October 11, 2024.

---

[4]     In this appeal, Urias does not contend that he was driving a sedan.

In relevant part, the trial court addressed the legality of Urias's seizure and whether the APS hearing violated Urias's right to due process.

With respect to due process, the trial court found no constitutional violation. Following *Knudsen v. Department of Motor Vehicles* (2024) 101 Cal.App.5th 186 (*Knudsen*) and appellate cases applying *Knudsen*, the court concluded the AHO constitutionally collected and developed evidence and then adjudicated the matter without impermissibly acting as an advocate on behalf of the DMV.

With respect to the initial seizure and continued seizure of Urias, the trial court found Davalos had reasonable suspicion that Urias had run the stop sign because Urias's vehicle was the same type and color as the gray SUV, Urias's vehicle was found within a few minutes of, and in the same general area as, the traffic violation, and there were few other vehicles on the road at 4:00 a.m. in that residential part of Shafter. The court noted Urias was not seized merely because Davalos engaged his scene light, rather Urias voluntarily stopped his vehicle next to Davalos. The court also found Davalos's observations of Urias were consistent with intoxication, and Davalos had reasonable suspicion to order Urias to turn off the SUV and initiate a DUI investigation. The court concluded that, after Urias's breath tests revealed BAC's of 0.084 and 0.083, Davalos had probable cause and properly arrested Urias for DUI.

I.     **Due Process**

A.     **Parties' Arguments**

Urias argues his due process rights were violated because the APS system requires an AHO to act as both an adjudicator and an advocate who represents the DMV at the APS hearing. Urias argues that *Knudsen*, and all of the cases that have followed *Knudsen*, were wrongly decided and inconsistent with California Supreme Court precedent and *CDLA*. In particular, Urias argues *Knudsen* took a dicta footnote from *CDLA* out of context and improperly looked at the actions of an AHO instead of the role of the AHO. Further, Urias argues the AHO's actions of choosing what documents to

7.

introduce, admitting the documents into evidence, and then making a decision based on those documents improperly combines advocacy with adjudication. Because it is the role of the AHO to act on the DMV's behalf, and thus act as its advocate, and because the AHO engaged in advocacy by choosing which documents to admit into evidence, Urias argues there was an unconstitutional probability of bias in his APS hearing. Urias contends that this due process error is structural and that reversal is required.

The DMV argues that Urias's due process rights were not violated. The DMV argues the record demonstrates that the AHO merely gathered and developed evidence, in addition to acting as the adjudicator. *CDLA*, California Supreme Court cases, *Knudsen*, and cases following *Knudsen* all recognize that such a combination of roles in one person is constitutionally permissible. The DMV also argues that there is no basis to disregard *Knudsen* or cases that follow *Knudsen*, and that Urias is improperly reading and expanding the holding of *CDLA*.

## B. Legal Standard

Challenges to the procedural fairness of an administrative hearing present a question of law that is reviewed de novo on appeal. (*Romane v. Department of Motor Vehicles* (2025) 110 Cal.App.5th 1002, 1016, review granted Aug. 13, 2025, S291093 (*Romane*);[5] *Knudsen*, *supra*, 101 Cal.App.5th at p. 210.) An irreducible minimum of the federal and California constitutional rights to due process is that an impartial adjudicator

---

[5]    Urias asserts that our Supreme Court has determined that *Romane* conflicts with *CDLA* based on the grant of review in *Romane*. As part of the grant of review, the Supreme Court stated: "Pending review, the opinion of the Court of Appeal … may be cited, not only for its persuasive value, but also for the limited purpose of establishing the existence of a conflict in authority that would in turn allow trial courts to exercise discretion … to choose between sides of any such conflict." (*Romane v. Department of Motor Vehicles* (2025) 335 Cal.Rptr.3d 275, 275–276.) Notably, the plain language of this grant of review does not mention *CDLA*, does not state that a conflict actually exists, and permits citation to *Romane* for its persuasive value only, irrespective of any actual or potential conflict with published authority. Without more, we cannot agree that the Supreme Court has determined *Romane* conflicts with *CDLA*.

must preside over a hearing. (*Today's Fresh Start, Inc. v. Los Angeles County Office of Education* (2013) 57 Cal.4th 197, 212 (*Today's Fresh Start*); *Knudsen*, at pp. 197–198.) The requirement of an impartial adjudicator is violated if the adjudicator is actually biased or operates under a constitutionally intolerable probability of bias. (*Morongo Band of Mission Indians v. State Water Resources Control Bd.* (2009) 45 Cal.4th 731, 737; *Knudsen*, at p. 198.) A violation of the due process right to an impartial adjudicator is a structural error that is not subject to a harm analysis. (*Clarke v. Gordon* (2024) 104 Cal.App.5th 1267, 1277 (*Clarke*); *Knudsen*, at p. 206.) The complaining party has the burden of demonstrating a due process violation based on the absence of a constitutionally impartial adjudicator by "com[ing] forward with 'specific evidence demonstrating actual bias or a particular combination of circumstances creating an unacceptable risk of bias.' " (*Today's Fresh Start*, at p. 221.)

Combining the roles of adjudicator and advocate into a single person is a violation of the due process right to an impartial adjudicator because it creates a constitutionally intolerable probability of bias. (*Kazelka v. Department of Motor Vehicles* (2025) 109 Cal.App.5th 1239, 1255 (*Kazelka*); *Knudsen, supra*, 101 Cal.App.5th at p. 199; *CDLA, supra*, 77 Cal.App.5th at p. 532.) Whether an AHO at an APS hearing unconstitutionally acted as the DMV's advocate is determined by examining the record, hearing transcripts, and the AHO's decision to see if the AHO engaged in advocacy.[6] (*Romane, supra*, 110

---

[6]      Recently, the First Distrct Court of Appeal disagreed with *Romane*'s and *Clarke*'s use of *Knudsen* to resolve due process challenges to APS hearings that occurred after *CDLA*. (*Chi v. Department of Motor Vehicles* (2026) 119 Cal.App.5th 473, 484–487 (*Chi*).) Although *Chi* recognized that the actions of an AHO could be relevant to demonstrating constitutional bias (*Chi*, pp. 486–487), it specifically faulted *Clarke* for focusing on the appearance of bias, rather than on the presence of disqualifying interests on the part of the adjudicator. (*Chi*, p. 486.) Nevertheless, *Chi* held that the post-*CDLA* format for APS hearings, which permitted AHO's to adjudicate and to collect and develop evidence, did not violate the due process right to an impartial adjudicator because AHOs act in an inquisitorial capacity under post-*CDLA* DMV policy. (*Chi*, pp. 482–484.) Because the result will not change whether we follow *Chi* or *Romane*, and because the

Cal.App.5th at p. 1020; *Kazelka*, at p. 1255; *Clarke*, *supra*, 104 Cal.App.5th at p. 1275; *Knudsen*, at pp. 206–207.)  If the record shows the AHO engaged in advocacy, and thus acted as the DMV's advocate, then due process is violated, and the driver is entitled to a new APS hearing before an impartial AHO.  (*Clarke*, at p. 1275; *Knudsen*, at pp. 193, 212–213; cf. *CDLA*, at p. 533, fn. 5 ["[An AHO] must refrain … from *advocating* on behalf of the DMV."].)

### C.     Analysis

At Urias's APS hearing, the AHO explained what issues would be decided and, consistent with both the *CDLA* injunction and the DMV's pre-hearing advisement, explained that he would be "acting as a neutral factfinder."  The AHO advised that he was "prohibited from and will not act as an advocate for the DMV or law enforcement," and was to "review the evidence as provided, ask clarifying questions of witnesses, if necessary, make legal rulings and determinations under the relevant statutes as necessary."  No witnesses were called or examined, and Urias's counsel was permitted to make her arguments without objection or interruption.  The AHO offered and admitted three records into evidence as exhibits:  Urias's driving record, Davalos's arrest report, and the DS-367 form.  Urias objected to the DS-367 form and Davalos's unsworn arrest report on hearsay grounds, and the objections were overruled.[7]  After Urias's counsel

---

issue is currently before the Supreme Court, we will follow the majority position as reflected in *Romane*.

[7]     Urias does not argue the objections were improperly overruled, and we also detect no error, let alone a clear and obvious error.  (Cf. *Knudsen*, *supra*, 101 Cal.App.5th at pp. 212–213 [finding an unconstitutional probability of bias in part because the AHO made a clear error of law that benefitted the DMV].)  It is well established that the rules governing the admission of evidence are relaxed at APS hearings (*MacDonald v. Gutierrez*, *supra*, 32 Cal.4th at p. 159), and that DS-367 forms and unsworn police reports are admissible and routinely admitted and considered at APS hearings.  (*Lake*, *supra*, 16 Cal.4th at pp. 451–452; *Romane*, *supra*, 110 Cal.App.5th at pp. 1016–1018; *Gerwig*, *supra*, 61 Cal.App.5th at pp. 65–66.)

concluded her arguments, the hearing ended. Further, there are no clear mischaracterizations of evidence in the AHO's decision that would indicate advocacy. Therefore, there are no acts of advocacy discernable from the record.

Given the conduct of the AHO, as well as the operative *CDLA* injunction and the pre-hearing and in-hearing advisements regarding the AHO's functions and roles (particularly as a "neutral fact-finder" and "not an advocate for the DMV"), there is no indication that the AHO acted as an advocate for the DMV or that Urias's due process right to a constitutionally impartial adjudicator was violated. (*Romane*, *supra*, 110 Cal.App.5th at pp. 1016–1021 [finding no due process violation where the AHO merely admitted evidence]; cf. *Knudsen*, *supra*, 101 Cal.App.5th at pp. 210–213 [finding a due process violation where the AHO mischaracterized evidence, made legal errors that benefitted the DMV, and asked questions that were not consistent with developing testimony].)

Urias argues the act of choosing what records to introduce, admitting those records, and then deciding the matter based on those chosen records shows the AHO functioned as an advocate. However, a government agency may constitutionally permit a single person within that agency to act as both an adjudicator and as a collector and developer of evidence in the same proceeding. (*Today's Fresh Start*, *supra*, 57 Cal.4th at p. 220; *Romane*, *supra*, 110 Cal.App.5th at pp. 1014–1015; *Kazelka*, *supra*, 109 Cal.App.5th at p. 1255; *Knudsen*, *supra*, 101 Cal.App.5th at p. 199; *CDLA*, *supra*, 77 Cal.App.5th at p. 533, fn. 5.) Further, when a driver is arrested for driving under the influence of alcohol, law enforcement officers are statutorily required to forward a sworn report to the DMV that includes the facts and circumstances of the arrest and the results of any BAC tests. (§ 13380; *Romane*, at pp. 1016–1017.) It is well established that a prima facie case sufficient to uphold the suspension of a driver's license may be established through admission of such documents because these documents generally establish the lawfulness of an arrest and the driver's BAC level. (See *Lake*, *supra*, 16

11.

Cal.4th at p. 451; *Romane*, at pp. 1016–1018; *Gerwig*, *supra*, 61 Cal.App.5th at pp. 65–66; *Delgado v. Department of Motor Vehicles* (2020) 50 Cal.App.5th 572, 577.) As a result, most APS hearings are resolved through the sworn and unsworn police records that have been forwarded to the DMV. (*Lake*, at p. 451; *Romane*, at pp. 1016–1018; *Gerwig*, at pp. 65–66.)

Given the routine and accepted practice of an AHO admitting police records at APS hearings, and law enforcement's statutory obligation to forward a sworn record to the DMV, the introduction and admission of these records do not involve independent investigatory work by the AHO or some form of pre-hearing assessment by the AHO in which multiple documents are examined in order to find and admit only the most damning evidence in favor of the DMV. Rather, the introduction and admission of forwarded police records that are routinely admitted in APS hearings (e.g., *Lake*, *supra*, 16 Cal.4th at p. 451; *Gerwig*, *supra*, 61 Cal.App.5th at pp. 65–66) are minimal acts of evidence collection and development that amount to no more than the AHO moving law enforcement's forwarded records from the DMV's file into the record of the APS hearing. Therefore, when an AHO in an APS hearing introduces and admits "the documents that law enforcement duly forward[] to the DMV, which are routinely admitted into evidence at APS hearings, the [AHO] is merely collecting and developing evidence, not advocating for the DMV."[8] (*Romane*, *supra*, 110 Cal.App.5th at p. 1018.) Because that is what the

---

[8]     Urias argues that *CDLA* rejected this argument and points to the following passage: "Due process protections are not dispensed with simply because the 'DMV hearing officer typically introduces two or three official documents into evidence and decides a limited number of issues.' Rather, 'whenever "due process requires a hearing, the adjudicator must be impartial." ' " (*CDLA*, *supra*, 77 Cal.App.5th at p. 532.) This statement was made in response to the DMV's attempts to distinguish the types of "overlap" functions regarding the hearing officers in *Howitt v. Superior Court* (1992) 3 Cal.App.4th 1575 and *Nightlife Partners, Ltd. v. City of Beverly Hills* (2003) 108 Cal.App.4th 81, with the functions of an AHO in an APS hearing. (*CDLA*, at p. 532.) The argument was clearly made in an attempt to save the DMV's *policy* of combining the roles of advocate and adjudicator. Because *CDLA* involved a taxpayer challenge to the

AHO did in this case, he did not act as an advocate. (*Ibid*.; cf. *Knudsen*, *supra*, 101 Cal.App.5th at pp. 206–207 [explaining that because an AHO may collect and develop evidence, and because a prima facie case for license revocation is often established through the submission of documents, "scenarios can easily be envisioned in which the [AHO] adjudicates without actually acting as an advocate"].)

To the extent Urias complains the DMV mandates that an AHO at an APS hearing acts as an adjudicator and a collector and developer of evidence, instead of providing one DMV official to act as an AHO and a second to act as an investigator, advocate, and/or developer of evidence, his complaint is misplaced. Administrative agencies are not required to import the full trial model in all administrative contexts. (*Today's Fresh Start*, *supra*, 57 Cal.4th at p. 220; *Chi*, *supra*, 119 Cal.App.5th at p. 482.) As a result, an agency may charge the *same individual* both with developing the facts and rendering a final decision. (*Today's Fresh Start*, at p. 220.) In relation to APS proceedings, it is universally agreed that the DMV may charge the same AHO with both adjudicating the matter and collecting and developing evidence at the APS hearing. (*Chi*, at p. 484; *Romane*, *supra*, 110 Cal.App.5th at p. 1021; *Kazelka*, *supra*, 109 Cal.App.5th at p. 1255; *Clarke*, *supra*, 104 Cal.App.5th at p. 1275–1276; *Knudsen*, *supra*, 101 Cal.App.5th at p. 207; *CDLA*, *supra*, 77 Cal.App.5th at p. 533, fn. 5 ["CDLA concedes the DMV may task the same person with both collecting and developing the evidence and rendering a final decision. [Citation.] He or she must refrain, however, from *advocating* on behalf of

APS system (*California DUI Lawyers Assn. v. Department of Motor Vehicles* (2018) 20 Cal.App.5th 1247, 1251, 1253, 1259), it was the DMV's policy that was at issue, not an actual APS hearing. What may happen in a "typical" APS hearing does not address the actual DMV *policy* being challenged. As such, we do not read the above quotation from *CDLA* to mean that the actual function and conduct of an AHO in an actual APS hearing can never be examined to determine whether the AHO was actually acting as both advocate and adjudicator, particularly when the DMV policy at issue in *CDLA* has been judicially enjoined and subsequently abandoned.

the DMV as the [DMV policy] currently mandates ….".].)[9] Particularly considering the evidence involved in this case, that is the standard forwarded documents that are routinely admitted in APS hearings, we see no reason to reach a contrary conclusion.

Finally, to the extent Urias contends we should presume that the AHO acted as an advocate, or that we should presume there exists a constitutionally intolerable probability of bias because the AHO does more than simply adjudicate the matter, we cannot agree. "Absent a financial interest, adjudicators are presumed impartial." (*Today's Fresh Start*, *supra*, 57 Cal.4th at p. 219.) It is true in *Knudsen* that the burden of demonstrating that an AHO did not act as an advocate was placed on the DMV. (*Knudsen*, *supra*, 101 Cal.App.5th at p. 207.) This burden was placed on the DMV because, before *CDLA*, DMV policy required an AHO in part to act as an advocate on behalf of the DMV. (*Knudsen*, at pp. 206–207; *CDLA*, *supra*, 77 Cal.App.5th at pp. 526, 532–533 & fn. 5.) Because courts presume that a governmental agency regularly follows its policies, *Knudsen* presumed that an AHO would have followed DMV policy and functioned as an advocate. (*Knudsen*, at pp. 206–207.) It was therefore appropriate to place the burden on

---

[9] Urias argues that *CDLA*'s footnote five is dicta that should be ignored. We disagree. "Dicta" involves " 'observations and statements unnecessary to the appellate court's resolution of the case.' " (*Sonic-Calabasas A, Inc. v. Moreno* (2013) 57 Cal.4th 1109, 1158.) Footnote five addressed an express argument made by the DMV in support of the DMV policy at issue. (*CDLA*, *supra*, 77 Cal.App.5th at p. 533, fn. 5.) Footnote five was also appended to a sentence that held "[S]ection 14112, subdivision (b) is unconstitutional to the extent it permits the DMV to combine the advocacy and adjudicatory roles in a single APS hearing officer." (*CDLA*, at p. 533.) Footnote five appears to clarify and emphasize that section 14112, subdivision (b) was unconstitutional only to the extent that it permitted a single individual to act as both adjudicator and advocate; other roles or functions could be combined in the same individual, such as adjudicator and collector and developer of evidence. This clarification not only explains the nature of *CDLA*'s holding, but also would have aided the trial court and the parties during the proceedings on remand. Because footnote five was " 'responsive to the issues raised on appeal and … intended to guide the parties and the trial court [on remand],' " footnote five of *CDLA* is not dicta. (*Sonic-Calabasas A*, at p. 1158; see *Leider v. Lewis* (2017) 2 Cal.5th 1121, 1134.)

14.

the DMV to rebut the presumption of regularity and show that an AHO did not in fact function as an advocate, that is the AHO did not engage in advocacy on behalf of the DMV. (See *ibid*.)

However, *CDLA* enjoined the DMV's policy and held that acting as both advocate and adjudicator created a constitutionally intolerable probability of bias. (*CDLA*, *supra*, 77 Cal.App.5th at pp. 526, 532, 538; see also *Knudsen*, *supra*, 101 Cal.App.5th at pp. 198–199.) Since *CDLA*, the DMV has not functioned under a policy that required AHO's to act as advocates. (*Chi*, *supra*, 119 Cal.App.5th at pp. 478–479, 483.) As a result, there is no basis to presume that an AHO acts as an advocate for the DMV. Because the policy at issue in *CDLA* is gone (*ibid*.), the starting point in examining any post-*CDLA* APS hearing is no longer that the AHO was acting as an advocate on behalf of the DMV per DMV policy. Rather, the starting point is that the AHO did not act as an advocate because no DMV policy was in place that mandated the AHO was to act as an advocate.

In fact, *CDLA* and current DMV policy prohibit AHOs from doing so. Accordingly, it is the driver's burden to show through specific evidence and argument, and without a presumption that an AHO followed a policy that required him or her to be the DMV's advocate, that an AHO was not constitutionally impartial. (See *Today's Fresh Start*, *supra*, 57 Cal.4th at p. 221; cf. *Knudsen*, *supra*, 101 Cal.App.5th at pp. 206–207.) "Otherwise, the presumption that agency adjudicators are people of ' "conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances" ' will stand unrebutted." (*Today's Fresh Start*, at pp. 221–222.) As discussed above, the AHO's conduct and the pre-hearing and in-hearing advisements regarding the AHO's role in the APS hearing all demonstrate that the AHO did not function as an advocate as prohibited by *CDLA*.

In sum, Urias has failed to meet his burden of demonstrating the DMV violated his due process right to an impartial adjudicator.

## II.  Lawfulness of Urias's Detention

### A.  Parties' Arguments

Urias argues his arrest for DUI was unlawful due to violations of the Fourth Amendment.  Contending that he was seized when Davalos turned on the scene lights and illuminated the SUV, Urias argues this seizure was unconstitutional because Davalos had lost sight of the gray SUV and had only a hunch that Urias was the driver of that vehicle.  Alternatively, he maintains that even if reasonable suspicion existed to stop him, Davalos unconstitutionally prolonged the encounter without reasonable suspicion.  Specifically, Urias asserts that after he denied speeding through the intersection, Davalos's investigation of the matter was required to end and Davalos was obligated to either let him go without asking further questions or to issue him a citation.

The DMV maintains that Urias was lawfully arrested.  They assert Urias was not seized but instead voluntarily stopped when Davalos engaged the scene lights.  The DMV also argues that Davalos had reasonable suspicion to believe Urias was the driver of the gray SUV that had sped through the intersection.  Finally, the DMV contends Davalos's inquiry was within the permissible scope of a traffic stop and did not unconstitutionally prolong the detention.

### B.  Legal Standards

#### 1.  Review of Petition for Writ of Mandate

In ruling on a petition for a writ of mandate following an order of license suspension, trial courts are to exercise their independent judgment and determine " ' "whether the weight of the evidence supported the administrative decision." ' " (*Lake*, *supra*, 16 Cal.4th at pp. 456–457; *Kazelka*, *supra*, 109 Cal.App.5th at p. 1247.)  On appeal, appellate courts review the record in order to determine whether the trial court's findings are supported by substantial evidence.  (*Lake*, at p. 457; *Kazelka*, at p. 1247.)  As part of the substantial evidence review, courts resolve all evidentiary conflicts and draw all reasonable inferences in favor of the trial court's decision.  (*Lake*, at p. 457; *Freitas v.*

*Shiomoto* (2016) 3 Cal.App.5th 294, 300.) However, issues raised in the appeal that involve pure questions of law are reviewed de novo. (*Freitas*, at p. 300; *Manriquez v. Gourley* (2003) 105 Cal.App.4th 1227, 1233.)

### 2. Fourth Amendment–Seizure of the Person Generally

The Fourth Amendment of the United States Constitution protects individuals against unreasonable searches and seizures by government actors. (See *Florida v. White* (1999) 526 U.S. 559, 563; *People v. Helzer* (2024) 15 Cal.5th 622, 645.) A seizure occurs if, under the totality of the circumstances, " 'a reasonable person would have believed that he was not free to leave.' " (*Brendlin v. California* (2007) 551 U.S. 249, 255; see *People v. Tacardon* (2022) 14 Cal.5th 235, 241 (*Tacardon*).) Whether a seizure has occurred is an objective inquiry that considers the relevant surrounding circumstances, including: the presence of multiple officers, an officer's display of a weapon, the use of a siren or overhead emergency lights, physically touching the person, the use of a patrol vehicle to block movement, or the use of language or of a tone of voice indicating that compliance with the officer's request is compelled. (See *Michigan v. Chesternut* (1988) 486 U.S. 567, 574–575; *Tacardon*, at pp. 241–242.) However, consensual encounters, in which law enforcement approach and engage an individual in consensual conversations or questions (so long as a reasonable person would understand he could refuse to cooperate), do not constitute a seizure and thus, do not implicate the Fourth Amendment. (*Florida v. Bostick* (1991) 501 U.S. 429, 434; *Tacardon*, at p. 241.) Further, an individual is not seized merely because he may feel himself the object of official police scrutiny. (*Tacardon*, at p. 250.)

### 3. Fourth Amendment–Traffic Stops

A traffic stop for a suspected violation of law is considered a seizure and must be performed in accordance with the Fourth Amendment. (*Heien v. North Carolina* (2014) 574 U.S. 54, 60; *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 145–146.) Accordingly, a traffic stop is constitutional if it is supported by at least reasonable

suspicion. (*Navarette v. California* (2014) 572 U.S. 393, 396–397; *Letner and Tobin*, at pp. 145–146.) Reasonable suspicion exists if an officer "can point to specific articulable facts that, considered in light of the totality of the circumstances, provide some objective manifestation that the person detained may be involved in criminal activity." (*People v. Souza* (1994) 9 Cal.4th 224, 231; see *United States v. Sokolow* (1989) 490 U.S. 1, 7.) Stated differently, reasonable suspicion exists if, under the totality of the circumstances, an officer has " 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.' " (*Navarette*, at pp. 396–397; *People v. Brown* (2015) 61 Cal.4th 968, 981.) Reasonable suspicion is a " 'less demanding standard' " than either probable cause or a preponderance of the evidence. (*Kansas v. Glover* (2020) 589 U.S. 376, 380 (*Glover*); *People v. Flores* (2024) 15 Cal.5th 1032, 1041 (*Flores*).) While a mere "hunch" is not sufficient, reasonable suspicion permits an officer to make " 'commonsense judgments and inferences about human behavior,' " and " 'depends on the factual and practical considerations of everyday life on which *reasonable and prudent men*, not legal technicians, act.' " (*Glover*, at pp. 380–381; *Flores*, at p. 1041.) Reasonable suspicion " 'need not rule out the possibility of innocent conduct.' " (*Navarette*, at p. 403; see *Letner and Tobin*, at pp. 146–147.)

### C.   Analysis

As both parties agree, we review Urias's Fourth Amendment arguments regarding the legality of his seizure using our independent judgment, but accept the express and implied findings of the trial court if they are supported by substantial evidence. (*People v. Tully* (2012) 54 Cal.4th 952, 979 (*Tully*); *People v. Sims* (2021) 59 Cal.App.5th 943, 950.) Exercising our independent judgment, we conclude that Urias's detention did not violate the Fourth Amendment.

### 1.   Activation of Scene Lights

Urias argues that he was seized when Davalos activated the patrol vehicle's white scene lights. We disagree.

In addressing the use of spotlights by law enforcement,[10] our Supreme Court has held the "use of a spotlight, standing alone, does not necessarily effect a detention," but otherwise has refused to establish any "bright-line" rules. (*Tacardon*, *supra*, 14 Cal.5th at p. 247.) Instead, courts "must consider the use of a spotlight together with all of the other circumstances." (*Ibid.*)

In this case, the totality of the circumstances demonstrate that Davalos was driving down a residential cul-de-sac around 3:47 a.m. Urias was in the process of making a three-point turn to get out of the cul-de-sac when Davalos began driving towards him. After Urias completed the three-point turn and was slowly approaching Davalos, Davalos turned on his scene lights to get a better view. Neither before turning on the scene lights nor immediately thereafter, was there any indication that Davalos had turned on his red and blue emergency lights, made any kind of motion for Urias to pull over, issued any commands to Urias, or displayed any weapons. (Cf. *Tacardon*, *supra*, 14 Cal.5th at pp. 241–242.) Nevertheless, after Davalos turned on the scene lights, Urias stopped next to Davalos's patrol vehicle (which apparently at some point had also stopped). In other words, Davalos was simply scrutinizing Urias and turned on his nonemergency scene lights because of low visibility, and Urias voluntarily stopped his SUV without prompting. (*Id.* at pp. 247, 250 [noting that police scrutiny alone and use of a spotlight alone do not constitute a seizure].) We detect nothing about the circumstance surrounding Davalos's use of his scene lights that would make a reasonable person in Urias's position believe that he was not free to keep driving away. (*Id.* at p. 241.) Therefore, under the totality of the circumstances, Urias was not seized for purposes of the Fourth Amendment when Davalos engaged his scene lights and Urias voluntarily

---

[10] We are unaware of any California cases that analyze law enforcement's use of "scene lights." Since scene lights seem to be used to light a general area, and spotlights are generally used to illuminate a smaller, specific area, we detect no reason why *Tacardon*'s analysis of spotlights would not also apply to Davalos's use of scene lights.

stopped his SUV. (*Id*. at p. 247 [holding that no detention occurred when an officer drove by a parked BMW, made eye contact with the defendant in the BMW, made a U-turn, parked 15 to 20 feet behind the BMW, turned the spotlight on the BMW, waited 20 seconds, and then began walking towards the BMW].)

### 2. Reasonable Suspicion

Urias contends that Davalos merely had a hunch that Urias was driving the gray SUV that he had observed speeding through the controlled intersection. Urias explains that Davalos was initially following taillights, lost sight of the gray SUV, and then "presumed" the headlights he saw belonged to the gray SUV. Urias argues this is "ironclad" evidence that Davalos only had a "hunch." However, Urias's argument is based on the legal conclusion that Davalos's use of scene lights effectuated a seizure. As explained above, this is not true. Urias was not seized for purposes of the Fourth Amendment when Davalos engaged his scene lights, rather, Urias voluntarily stopped his vehicle. Therefore, Davalos's use of the scene lights was not required to be supported by reasonable suspicion. (*Tacardon*, *supra*, 14 Cal.5th at p. 247.)

Moreover, we agree with the trial court that Davalos had more than just a "hunch" that Urias had committed a traffic violation. Davalos initially followed the gray SUV that he had observed speed through the controlled intersection. When Davalos lost sight of the gray SUV, he drove around the general area where he had last seen the gray SUV in an attempt to find it. There is no indication that other vehicles were in the area, nor is it likely that there would be, considering that Davalos was searching for the gray SUV at 3:45 a.m., a time in which it is widely known and understood that there is very little traffic on city roads (particularly in an area the trial court indicated was residential in nature). Further, because Davalos had engaged his scene lights and Urias had stopped right beside him after the scene lights were turned on, Davalos would have been aware

20.

that Urias was driving a gray SUV.[11]  Finally, the DS-367 form and Davalos's arrest report indicate that approximately two minutes had elapsed from the time Davalos saw the gray SUV speed through the intersection at 3:45 a.m. to the time he made contact with Urias at 3:47 a.m.  Reasonable suspicion is based on common sense experiences and inferences and is a lower standard than both probable cause and a preponderance of the evidence.  (*Glover*, *supra*, 589 U.S. at pp. 380–381; *Flores*, *supra*, 15 Cal.5th at p. 1041.)  Given the area where Urias was found, the time of day Urias was found, the short period of time (about two minutes) between Davalos's initial observation of the gray SUV and his making contact with Urias, and the type and color of vehicle that Urias was driving, these specific articulable facts constitute reasonable suspicion that Urias was the driver of the gray SUV that Davalos had seen illegally speed through the intersection.[12]  (*Glover*,

---

[11]  We note the arrest report states that after he believed that Urias was driving under the influence, Davalos activated his red and blue emergency lights and pulled behind Urias's SUV, "which was revealed to be a gray Acura MDX displaying California license plate [number] …."  However, we do not read the arrest report as meaning Davalos only discovered it was a gray SUV after he engaged his emergency red and blue lights and pulled behind the SUV.  Because the SUV had been illuminated by the scene lights and had stopped beside the patrol vehicle, it is unreasonable to believe that Davalos did not know the SUV was gray until after he pulled behind the SUV.  Instead, we view this passage of the arrest report as providing additional information about the SUV that became apparent from being behind the SUV, specifically the make, model and license plate number, none of which would have been apparent to Davalos from his view of the side of the SUV.

[12]  Our conclusion does not change simply because Davalos's police report uses the term "presumed."  Again, reasonable suspicion includes the commonsense inferences and judgments that flow from the specific articulable facts known to the officer.  Given the specific articulable facts described above, we think that Davalos's "presumption" is synonymous with "deduction" or "inference."  (*Glover*, *supra*, 589 U.S. at pp. 380–381 [reasonable suspicion is based on commonsense inferences and judgments]; *Flores*, *supra*, 15 Cal.5th at p. 1041 [same].)  Further, that an inference or a particular suspicion of illegal activity may ultimately prove to be incorrect does not negate the fact that the officer had a reasonable suspicion, and thus acted constitutionally, in the first instance.  (*Flores*, at p. 1050.)

at pp. 380–381; *Navarette v. California*, *supra*, 572 U.S. at p. 397; *Flores*, at p. 1041; *People v. Brown*, *supra*, 61 Cal.4th at p. 981.)

### 3. Exceeding the Scope of the Initial Detention

Urias argues that even if reasonable suspicion existed that he had sped through the controlled intersection, the detention was unconstitutionally prolonged when he was asked what he was doing after he stated that he had not sped through the intersection. Like his argument regarding reasonable suspicion, Urias's argument appears to be premised on the legal conclusion that he was seized when Davalos engaged the scene lights. Again, Urias was not seized for purposes of the Fourth Amendment when Davalos engaged his scene lights, rather, Urias voluntarily stopped his vehicle next Davalos. As a consensual encounter, Davalos was free to ask what Urias was doing in the area irrespective of reasonable suspicion.

Alternatively, Urias is correct that the scope of a detention for a traffic stop is generally limited to discussions regarding the traffic violation at issue and to the performance of ordinary tasks that are incident to a traffic stop. (*Rodriguez v. United States* (2015) 575 U.S. 348, 354–356; *People v. Felix* (2024) 100 Cal.App.5th 439, 448 (*Felix*); *People v. Gyorgy* (2023) 93 Cal.App.5th 659, 669–670 (*Gyorgy*).) Inquiries beyond the scope of the traffic stop that are not themselves supported by reasonable suspicion unconstitutionally prolong the traffic detention. (*Rodriguez*, at p. 355; *Gyorgy*, at pp. 670–671.) However, assuming that Urias was seized and that reasonable suspicion existed to believe that Urias had sped through the controlled intersection, we cannot agree that Davalos had to either let Urias go or write a citation after Urias said that he had not sped through the controlled intersection.

Law enforcement may discuss with and make relevant inquiries to a driver regarding the traffic violation at issue. (See *Tully*, *supra*, 54 Cal.4th at p. 981; *Felix*, *supra*, 100 Cal.App.5th at p. 448; *Gyorgy*, *supra*, 93 Cal.App.5th at p. 670.) By asking what Urias was doing in the area, it is possible that Davalos could learn additional

22.

information that would have placed Urias near the relevant intersection within the last few minutes. Such information would make it more likely that Urias had in fact sped through the controlled intersection. While different or more direct questions could have been asked along those lines, officers are not required to ask only a specific set of investigatory or follow-up questions. The fact remains that relevant information regarding the traffic violation could have been obtained from Urias's answer to Davalos's question, and we cannot accept that Davalos's investigation into the traffic violation was required to end simply because Urias answered "no" to a pointed a question.

We are aware of no authority that requires law enforcement to accept a driver's simple and blanket denial of wrongdoing and that forbids any related follow-up questions. Therefore, because Davalos's follow-up question as to what Urias was doing could have yielded relevant information and was not too unrelated to the traffic violation at issue, Davalos's single follow-up question did not unconstitutionally prolong Urias's seizure.[13] (*Rodriguez v. United States*, *supra*, 575 U.S. at pp. 354–356; *Tully*, *supra*, 54 Cal.4th at p. 981; *Felix*, *supra*, 100 Cal.App.5th at p. 448 [finding that a question about where the driver was "headed" was a proper and a typical traffic stop inquiry]; *Gyorgy*, *supra*, 93 Cal.App.5th at pp. 670–671.)

---

[13] Further, after Urias explained what he was doing in the area, Davalos had reasonable suspicion to formally detain Urias and transform the traffic stop into a DUI investigation. Specifically, Davalos had just observed Urias driving on Tamera Avenue and Bree Drive and, as Urias was answering Davalos, Davalos noticed that Urias's words were slurred, Urias had red watery eyes, and Urias was sweating despite mild temperatures. Further, when Davalos approached the gray SUV, he could smell the odor of alcohol. (Cf. *Salazar v. Burresch* (C.D. Cal. 1999) 47 F.Supp.2d 1105, 1108 [noting that red watery eyes, slurred speech, and an odor of alcohol are all objective signs of being under the influence of alcohol]; *Ramirez v. Department of Motor Vehicles* (2023) 88 Cal.App.5th 1313, 1317–1318 [officer described same signs as symptoms of being under the influence of alcohol].)

## **DISPOSITION**

The judgment is affirmed.  DMV is entitled to its costs on appeal.


HARRELL, J.

WE CONCUR:


DETJEN, Acting P. J.


PEÑA, J.